JS-5

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COACH, INC., a Maryland Corporation; and COACH SERVICES, INC., a Maryland Corporation,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>CELCO CUSTOMS SERVICES CO.; a California Corporation; and DOES ONE through TEN, inclusive,<br><br>                    Defendants. | CASE NO. CV 11-10787 MMM (FMOx)<br><br>ORDER DENYING DEFENDANT'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW; GRANTING DEFENDANT'S RULE 59 MOTION FOR NEW TRIAL |

## I.  BACKGROUND

### A.    Procedural Background

On December 29, 2011, Coach, Inc. and Coach Services, Inc. (collectively, "Coach")
commenced this action against Celco Customs Services Co. ("Celco") and certain fictitious

defendants.[1]  On July 6, 2012, Coach filed, with leave of court, a first amended complaint, adding Shen Huei Feng Wang, a.k.a. Celine Wang ("Wang") as a defendant.[2]  The court dismissed the first amended complaint on October 31, 2012.[3]  On November 9, 2012, Coach filed a second amended complaint,[4] which the court dismissed in part on January 28, 2013.[5]  On March 26, 2013, the following claims were tried to a jury: (1) contributory trademark infringement; (2) contributory false designation of origin; and (3) unlawful importation.  At the close of Coach's evidence, defendants made a Rule 50(a) motion; they asserted that Coach had failed to present sufficient evidence to prove the elements of its claims and sought to have judgment in their favor. The court denied the motion.  On March 28, 2013 the jury returned a verdict in favor of plaintiffs on all claims, awarding $8 million in statutory damages.  On September 20, 2013, defendants filed motions for judgment as a matter of law under Rule 50(b).  They also moved for a new trial under Rule 59(a) or, alternatively, for an order altering or amending the judgment under Rule 59(e) of the Federal Rules of Civil Procedure.[6]

**B.  Facts Presented at Trial**

Wang is the president and sole owner of Celco, a customs broker.[7]  As a customs broker, Celco files entry papers with U.S. Customs that permit the importation of goods into the United

---

[1]Complaint, Docket No. 1 (Dec. 29, 2011).

[2]First Amended Complaint, Docket No. 23 (July 6, 2012).

[3]Order Granting Defendant's Motion to Dismiss, Docket No. 39 (Oct. 31, 2012).

[4]Second Amended Complaint ("SAC"), Docket No. 40 (Nov. 9, 2012).

[5]Order Granting in Party and Denying in Part Defendant's Motion to Dismiss, Docket No. 61 (Jan. 28, 2013).

[6]Motion for New Trial ("Rule 59 Motion"), Docket No. 159 (Sept. 20, 2013); Motion for Renewal of Judgment as a Matter of Law ("Rule 50(b) Motion"), Docket No. 163 (Sept. 26, 2013).

[7]Reporter's Transcript of Jury Trial ("RT") at 171:22-172:1-4, 227:21-23.

States.[8]    Celco uses the government's Automated Broker Interface (ABI) system to file electronically a document known as a Form 3461.  Form 3461 allows goods to "enter" the United States officially.[9]  Celco charges $65 to $85 per transaction, and processed approximately 4,700 entry transactions in 2009.[10]  It charged $65 for the entry transaction at issue in this case.[11]  Coach is a U.S. company that manufactures handbags, wallets, and other products for distribution throughout the United States and in twenty other countries.[12]

Wang testified that, in connection with entering the shipment at issue, she received a power of attorney form from Eastern Direct, a freight forwarder, on July 27, 2009.[13]  The form was executed by Robert Laurance, and authorized Celco to enter a container of goods into the United States on behalf of Pierce Chemical Company.[14]  When Wang queried the ABI system, she determined that the taxpayer identification on the power of attorney belonged to Pierce Biotechnologies, Inc.[15]  She testified that after noticing the discrepancy in the names listed on the power of attorney and in the ABI system, she requested an IRS letter from Eastern Direct.[16]  She stated that an IRS letter could be used to verify a power of attorney because it can confirm that the tax identification number matches the company name and address.[17]  She conceded that she

---

[8]*Id.* at 172:20-23.

[9]*Id.* at 172:20-173:10, 211:6-13.

[10]*Id.* at 344:15-345:1.

[11]*Id.* at 270:8-10.

[12]*Id.* at 123:13-25, 124:5-19.

[13]*Id.* at 180:21-181:9; Declaration of Samuel R. Watkins ("Watkins Decl."), Docket No. 164-1 (Oct. 3, 2013), Exh. E (Trial Exh. 8-2).

[14]RT at 179:24-180:20.

[15]*Id.* at 183:2-21.

[16]*Id.* at 183:25-184:2, 206:18-23, 338:4-9.

[17]*Id.* at 177:10-178:1.

made no attempt to contact Laurance or anyone at Pierce Biotechnology to clear up the discrepancy.[18]

Later in the day on July 27, 2009, although she had not yet received the IRS letter, Wang entered the goods into the United States.[19]  She testified that she believed Pierce Chemical Company was a d/b/a for Pierce Biotechnologies, and that she was able to later verify this fact.[20]

Elon Pollack, Coach's expert witness, testified that generally, when a company uses a d/b/a, that fact will be noted on the power of attorney form; the power of attorney Wang received, however, contained no such notation.[21]  Pollack asserted that a customs broker may enter goods only on behalf of the entity identified on the power of attorney form, and that filing entry papers in the name of an entity other than that listed on the power of attorney exposes a broker to a $10,000 per transaction fine and revocation of its brokerage license.[22]  Pollack opined that there are several standard industry practices a customs broker can employ to clear up a discrepancy in the name on a power of attorney, e.g., contacting the importer directly.  Defendants did not take any of these steps with respect to the transaction in question.[23]  Wang testified that she and the freight forwarder agreed that she would not contact Pierce Biotechnology directly; Pollack testified that such an agreement violates customs regulations.[24]  Wang acknowledged she had encountered a fake power of attorney in 2002, when Celco entered a shipment of counterfeit cigarettes that the manifest indicated were plastic toys.[25]

---

[18]*Id.* at 206:12-17, 208:7-19.

[19]*Id.* at 211:6-13.

[20]*Id.* at 205:16-206:11, 209:23-25, 210:6.

[21]*Id.* at 311:2-16; Watkins Decl., Exh. E (Trial Exh. 8-2).

[22]RT at 299:2-302:24, 305:17-306:3, 318:1-5.

[23]*Id.* at 302:25-305:16.

[24]*Id.* at 216:18-217:16, 303:20-304:8.

[25]*Id.* at 270:24-274:22, 346:9-347:17, 401:5-11.

Minutes after entering the goods for Pierce Chemical Company, Wang was informed by Customs and Border Protection ("CBP") that it had put a hold on the shipment.[26] CBP requested copies of all documents related to the shipment. Wang instructed her employee, Wen Shi, to sign the Form 3461, even though Wang had completed the form, the form required a certification that it was accurate, and Wen Shi knew nothing about the document.[27]

The seized shipment contained 22,040 handbags and 10,300 wallets, which CBP identified as bearing counterfeit trademark TMK 09-00492.[28] TMK 09-00492 corresponds to Coach's Horse and Carriage trademark.[29] Ethan Lau, Coach's in-house counsel, testified that counterfeit Gucci belts were found in the shipment along with counterfeit Coach products.[30] He asserted that Coach never ships its products with other brands.[31]

On July 30, 2009, two customs officers visited Celco.[32] Wang did not introduce herself to the agents or speak with them during their visit; instead, she listened to their conversation with her employee, Roy Lee, from her office.[33] After the CBP agents left, Wang learned from Lee that someone had stolen Pierce Biotechnology's identity, and that CBP intended to seize the shipments.[34]

---

[26]*Id.* at 211:19-25.

[27]*Id.* at 212:1-4, 212:14-215:18.

[28]Watkins Decl., Exh. E (Trial Exh. 4).

[29]RT at 136:18-25; 157:7-11; Watkins Decl., Exh. E (Trial Exh. 40).

[30]RT at 330:25-331:3.

[31]*Id.* at 331:4-12.

[32]*Id.* at 224:4-11, 342:5-7.

[33]*Id.* at 224:4-231:22.

[34]*Id.*

On September 8, 2009, CBP sent Coach a Notice of Seizure.[35] At trial, Coach introduced CBP's letter response to a Freedom of Information Act request that sought documents related to the seized Coach items.[36]  The letter states: "You have requested documents pertaining to Case 2009-2704-001104 on behalf of Coach";[37] this case number corresponds to the seized Coach items.[38]  Attached to the letter were four photographs released pursuant to 19 C.F.R. §§ 133.21 and 103.32;[39] section 133.21(b)(3) authorizes CBP to provide the owner of a mark images or a sample of the detained merchandise.  Lau reviewed the photographs received from CBP.[40] Customs destroyed the seized goods prior to the date Coach filed suit, and no samples of the seized items were admitted at trial.

Coach also introduced two color photographs of a genuine Coach handbag and wallet.[41] The handbag and wallet each bear registered Coach trademarks.[42] Lau testified that these genuine items and the items seized by CBP are of a "comparable style," that the photograph of the genuine Coach handbag "resemble[d]" the types of handbags reflected in the photographs CBP sent to Coach, and that the image of the genuine Coach wallet was "very similar" to the wallets seized

---

[35]Watkins Decl., Exh. E (Trial Exh. 4).

[36]RT 283:12-285:15; Watkins Decl., Exh. E (Trial Exh. 31).

[37]Watkins Decl., Exh. E (Trial Exh. 31-1).

[38]RT 329:7-330:7; Watkins Decl., Exh. E (Trial Exhs. 4, 5).

[39]Watkins Decl., Exh. E (Trial Exh. 31); RT at 285:1-15.

[40]RT at 285:14-15.

[41]Watkins Decl., Exh. E (Trial Exhs. 47-1, 47-2).

[42]RT at 147:5-23; Watkins Decl., Exh. E (Trial Exh. 34); RT at 157:4-15; Watkins Decl., Exh. E (Trial Exh. 40); RT at 158:23-159:3; Watkins Decl., Exh. E (Trial Exh. 42); RT at 150:25-151:16; Watkins Decl., Exh. E (Trial Exh. 36); RT at 153:19-154:7; Watkins Decl., Exh. E (Trial Exh. 38). See also id., Exh. E (Trial Exhs. 47-1, 47-2).

1    by CBP.[43]  Lau stated that 2009 retail prices for genuine Coach items ranged from $268 to $298

2    per handbag, and $168 to $198 per wallet.[44]

3           **C.     Request for Judicial Notice**

4           Defendants have filed a request for judicial notice in support of their motion for new trial.[45]

5    They ask that the court judicially notice a printout from the website of the Illinois Secretary of

6    State.[46]  The printout is a "corporation file detail report" for Pierce Biotechnology, Inc.; it lists

7    "Pierce Chemical Company" as an "Old Corp[orate] Name," with the date "06/06/2002."[47]

8    Coach objects that defendants' request is an improper attempt to supplement the trial record, and

9    that the evidence is highly prejudicial.[48]  It asserts that defendants must file a noticed motion to

10   have the document considered so that it will have an opportunity to respond.[49]  Given that Coach

11   advances numerous arguments as to why the web page does not support granting defendants a new

12   trial, it appears to have had adequate opportunity to respond.[50]

13   _____

14        [43]RT at 143:23-144:6; 145:19-22; 285:1-15; 145:23-146:7.

15        [44]*Id.* at 286:4-18.

16        [45]Request for Judicial Notice, Docket No. 169 (Dec. 26, 2013).

17        [46]*Id.* at 2; *id.*, Exh. A.

18

19        [47]*Id.*, Exh. A.  The significance of the date "06/06/2002" is unclear from the face of the
     document.  The court cannot determine whether it refers to the date the name "Pierce Chemical
20   Company" began to be used or ceased to be used, or to something else.

21        [48]Objections to Defendants' Request for Judicial Notice, Docket No. 170 (Dec. 30, 2013)
22   at 2.

23        [49]*Id.*

24        [50]As support for its position that the court should deny the request, Coach cites *Lowry v.*
25   *Barnhart*, 329 F.3d 1019 (9th Cir. 2003).  That case, however, recognized that an appellate court
     can take judicial notice of appropriate documents and in this way augment the district court record
26   on appeal.  *Id.* at 1024 ("Save in unusual circumstances, we consider only the district court record
     on appeal. . . .  There are exceptions to the general rule.  We may . . . take judicial notice, see
27   Fed.R.Evid. 201(f)").  As one recognized basis for granting a new trial is newly discovered
28   evidence, see, e.g., *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 998 (9th Cir. 2001), it

1  The court can judicially notice a fact that (1) is generally known within the trial court's
2  territorial jurisdiction; or (2) can be accurately and readily determined from sources whose
3  accuracy cannot be easily questioned. FED.R.EVID. 201(b).  To the extent the contents of a
4  document are in dispute, however, they "are not appropriate subjects for judicial notice." *United*
5  *States v. Southern Cal. Edison Co.*, 300 F.Supp.2d 964, 975 (E.D. Cal. 2004) (quoting *Del*
6  *Puerto Water Dist. v. U.S. Bureau of Reclamation*, 271 F.Supp.2d 1224 (E.D. Cal. 2003)).

7  Coach does not dispute the accuracy of the document, and the court concludes that the
8  accuracy of its source – the Illinois Secretary of State –  cannot be easily questioned.  The court
9  therefore takes judicial notice of the web page.  See, e.g., *Jacques v. Hyatt Corp.*, No. C 11-
10  05364, 2012 WL 3010969, *1 (N.D. Cal. July 23, 2012) ("This order takes judicial notice of the
11  California Secretary of State 'Business Entity Detail' for Hyatt Corporation, as the contents of this
12  document[ ] are not subject to reasonable dispute in that, as a government website, it is capable
13  of accurate and ready determination by resort to sources whose accuracy cannot reasonably be
14  questioned").

## II.  DISCUSSION

### A.    Whether Defendants' Rule 50(b) Motion Was Untimely

18  Coach argues that defendants' Rule 50(b) motion was not timely filed, and must be denied
19  on this basis alone.[51]  A renewed motion for judgment as a matter of law must be filed no later
20  than 28 days after the date of entry of judgment.  FED.R.CIV.PROC. 50(b); *Broadcom Corp. v.*
21  *Emulex Corp.*, Nos. SACV 09–01058-JVS (ANx), CV 10–03963–JVS (ANx), 2011 WL
22  7560650, *1 (C.D. Cal. Dec. 13, 2011) (citing Rule 50(b)).  The court entered final judgment on

cannot be the rule that courts cannot consider evidence outside the trial record in deciding such
motions.

[51]Opposition to Motion for Renewal of Judgment as a Matter of Law ("Rule 50(b) Opp."),
Docket No. 165 (Dec. 13, 2013) at 11.

1   August 26, 2013;[52] consequently, defendants were required to file their Rule 50(b) motion no later

2   than September 23, 2013.  Defendants e-filed the motion on September 20, 2013,[53] three days

3   before the deadline.  Because they selected the wrong event and incorrectly filed the motion as an

4   "application," the clerk struck the filing on September 26, 2013, and directed defendants to file

5   the motion under the correct event.[54]  Defendants did so the same day.

6          Rule 5(d)(4) of the Federal Rules of Civil Procedure provides that "[t]he clerk must not

7   refuse to file a paper solely because it is not in the form prescribed by these rules or by a local

8   rule or practice."  FED.R.CIV.PROC. 5(d)(4).  See *Klemm v. Astrue*, 543 F.3d 1139, 1143 (9th

9   Cir. 2008) (holding that the clerk was obligated to accept appellant's notice of appeal for filing,

10  even though appellant failed to comply with local filing rules, citing FED.R.CIV.PROC. 5(d)(4));

11  *MD Propertyco, LLC v. Mad Dog Saloon AZ, L.L.C.*, No. CV–12–2516–PHX–LOA, 2012 WL

12  5984950, *3 (D. Ariz. Nov. 28, 2012) ("[T]he Clerk of Court is not authorized to strike a

13  non-conforming pleading or filing," citing FED.R.CIV.PROC. 5(d)(4)); *Zepeda v. Walker*, 564

14  F.Supp.2d 1179, 1183 (C.D. Cal. 2008) ("[A] pleading may be deemed filed even if the pleading

15  is not in compliance with filing rules," citing *Ordonez v. Johnson*, 254 F.3d 814, 816 (9th Cir.

16  2001) ("We have previously held that a complaint is filed when it is placed in the actual or

17  constructive custody of the clerk [of the court], despite any subsequent rejection by [the clerk] of

18  the pleading for non-compliance with a provision of the local rules" (internal quotation omitted;

19  alterations original), and *Artuz v. Bennett*, 531 U.S. 4, 8 (2000)).  Accordingly, defendants' Rule

20  50(b) motion must be deemed to have been filed on September 20, the date it was first submitted

21  to the court.  The motion is thus timely and the court will consider its merits.

---

[52]Final Judgment on the Verdict for the Plaintiff ("Final Judgment"), Docket No. 157 (Aug. 26, 2013).

[53]Application for Renewal of Motion for Judgment as a Matter of Law, Docket No. 158 (Sept. 20, 2013).

[54]Text Entry Striking Document, Docket No. 162 (Sept. 26, 2013).

### B.   Legal Standard Under Rule 50

Rule 50(b) of the Federal Rules of Civil Procedure allows the court to enter judgment as a matter of law following trial or verdict where there is no legally sufficient evidentiary basis upon which a reasonable jury could have found for the non-moving party.  Judgment as a matter of law should be granted if the evidence, "construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion as to the verdict and that conclusion is contrary to the jury." *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002); *McLean v. Runyon*, 222 F.3d 1150, 1153 (9th Cir. 2000).  See also *Bank of the West v. Valley Nat'l. Bank of Arizona*, 41 F.3d 471, 477 (9th Cir. 1994) ("We must determine, *de novo*, whether viewing the evidence as a whole, there was substantial evidence present that could support a finding, by reasonable jurors, for [the nonmoving party]").

In ruling on a motion for judgment as a matter of law, the court may not weigh the evidence or assess the credibility of witnesses.  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 59-60 (2d Cir. 1993).  Rather, as the Supreme Court instructed in *Reeves*, the court must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151.

If the verdict is supported by substantial evidence, the court cannot substitute its judgment for that of the jury, but must uphold the verdict.  *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1226 (9th Cir.), cert. denied, 534 U.S. 1055 (2001); *United States for Use and Benefit of Reed v. Callahan*, 884 F.2d 1180, 1183 (9th Cir. 1989).  Substantial evidence is such relevant evidence as reasonable minds might consider adequate to support a conclusion, even if it is possible to draw two contrary conclusions from the evidence.  *Landes Construction Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).

 Under Rule 50(a), "a defendant may request the trial court to grant a judgment as a matter of law at the close of plaintiff's evidence, or at the close of all of the evidence, if 'there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party. . . .'  After a jury verdict, the moving party may *renew* its request for a judgment as a matter of law under Rule 50(b)." *Desrosiers v. Flight International of Florida, Inc.*, 156 F.3d 952, 956 (9th Cir.

1998).  ("Under Federal Rule of Civil Procedure 50(a), a defendant may request the trial court to grant a judgment as a matter of law at the close of plaintiff's evidence, or at the close of all of the evidence, if 'there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party. . . .'  After a jury verdict, the moving party may renew its request for a judgment as a matter of law under Rule 50(b)" (emphasis original)).

A post-verdict Rule 50(b) motion is "limited to the grounds asserted in the pre-deliberation Rule 50(a) motion.  Thus, a party cannot properly 'raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion.'"  *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quoting *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003), and citing *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990)).

### C.   Whether the Court Should Grant Defendants' Rule 50(b) Motion

In their Rule 50(a) motion, defendants advanced three arguments as to why the court should enter judgment in their favor: (1) Coach had not proved trademark infringement because it did not introduce any infringing products in evidence;[55] (2) Coach had not proved contributory infringement because there was no evidence that either defendant had knowledge of the direct infringer and his or her plans;[56] and (3) statutory damages were unavailable because there was no evidence that the goods were ever sold, offered for sale, or distributed in the United States, and injunctive relief was not available because Coach suffered no actual damages.[57]  Defendants raise

---

[55]"First of all, based on the evidence, . . . no infringing products was [sic] introduced or admitted, and so, therefore, the plaintiff will not be able to prove any infringement of their products."  (RT at 358:1-4.)

[56]"The second reason is there is no evidence to show that the defendant – either defendant have [sic] any knowledge of who is the right infringer and what they plan to do, so, therefore, the elements of contributory infringement are not met."  (*Id.* at 385:5-9.)

[57]"And the third one – I believe the Court may have previously overruled my objection before – is on the issue of statutory damages, because based on our interpretation of the code, based on 15 U.S.C. [§§] 1116 and 1117, the statutory damages only applies [sic] to counterfeit goods, and the counterfeit goods were specifically defined in 1116 and also referenced by 1117, which means the goods must be sold, offered for sale, or distributed as in use, and there is no

the first two of these arguments in their Rule 50(b), but do not mention the third.  In addition, they
assert for the first time myriad arguments not included in their Rule 50(a) motion.  Coach
contends that neither issues raised for the first time in defendants' Rule 50(b) motion, nor issues
raised in defendants' Rule 50(a) motion but not in their Rule 50(b) motion – arguments it contends
have been abandoned – can serve as the basis for granting judgment as a matter of law.[58]

In response, defendants cite *Go Daddy Software, Inc.*, 259 F.3d 1101, a requirement that
the arguments on which a Rule 50(b) motion is based must have been raised pre-verdict in a Rule
50(a) motion.[59]  In that wrongful termination case, Go Daddy moved in district court for judgment
as a matter of law under Rule 50(b), or, in the alternative, for a new trial under Rule 59(a).  581
F.3d at 954.  The district court denied both motions, and Go Daddy appealed.  *Id.*  Go Daddy's
Rule 50(a) motion had asserted that plaintiff made "alleged reports" of improper workplace
behavior to one manager, who did not communicate them to fellow members of a panel that

_____

evidence such  merchandise was under that condition in this case.

In fact, the merchandise never entered the United States because it was seized and
destroyed by the customs.

So since plaintiff only asking for [sic] two remedies in this case, injunction and statutory
damages, because there is no actual damages which has been considered from the outset, under
the injunction, if we read the prayer, plaintiffs' injunction is to seek to enjoin defendants' acts,
again, in the sale, offered for sale, or distribution, and there is no such activity at all.

I don't believe the plaintiff is entitled to any injunction on something which is not relevant
to the case or perspective, so, therefore, based on those grounds, I believe the Court should enter
judgment in favor of defendants – both defendants, not against plaintiffs."  (*Id.* at 358:10-359:7.)

On March 25, 2013, prior to the beginning of trial, defendants filed a "notice of intent to
file motion for judgment as a matter of law," in which they raised the additional argument that
Coach could not prove liability under the Tariff Act because it relied on an outdated code section,
had not proved there were infringing goods, and had failed to prove importation.  (Notice of Intent
to File Motion for Judgment as a Matter of Law, Docket No. 111 (Mar. 25, 2013) at 3.)
Defendants, however, did not raise this argument in their Rule 50(a) motion, and it cannot be
considered as a result.

[58]Rule 50(b) Opp. at 12.  Coach contends that defendants have failed to raise both the
second and third arguments advanced in their Rule 50(a) motion in their present Rule 50(b)
motion, and thus have abandoned these arguments.  (*Id.*)

[59]Reply in Support of Renewed Motion for Judgment as a Matter of Law ("Rule 50(b)
Reply"), Docket No. 166 (Dec. 26, 2013).

decided to terminate plaintiff. Go Daddy argued that "knowledge by one of the three panel members is insufficient for the jury to return a verdict on retaliation." *Id.* at 962. Its post-verdict Rule 50(b) motion, by contrast, asserted that there was insufficient evidence to show that plaintiff had engaged in protected activity; that there was insufficient evidence that the panel member to whom the reports were made told her fellow panel members; and that, as a consequence, the reports could not have motivated plaintiff's termination. *Id.*

The Ninth Circuit did not state whether the district court had considered the new arguments. It noted, however, that while a proper motion under Rule 50(b) is reviewed to determine if substantial evidence supports the verdict, a Rule 50(b) motion made on grounds not previously asserted in a Rule 50(a) motion is reviewed for plain error and can be reversed only if plain error would result in a miscarriage of justice. *Id.* at 961; see also *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1109 (9th Cir. 2001) ("This exception, however, permits only extraordinarily deferential review that is limited to whether there was *any* evidence to support the jury's verdict, irrespective of its sufficiency" (internal quotation marks omitted; emphasis original)).

In analyzing the district court's denial of GoDaddy's Rule 50(b) motion, the court noted that Rule 50(b) can "be satisfied by an ambiguous or inartfully made motion," and cited *Reeves v. Teuscher*, 881 F.2d 1495 (9th Cir. 1989), as support for this proposition. *GoDaddy Software*, 581 F.3d at 961. In *Reeves*, defendants attempted to make a Rule 50(a) motion after the close of all the evidence. The district court interrupted them, however, and told them to renew the motion after the verdict. 881 F.2d at 1498. The court stated that "[i]n these circumstances their motion suffice[d]." *Id.* It did not address, however, how liberally the arguments advanced in such a motion should be construed. See *id.* ("A party under Fed.R.Civ.P. 50(b) must move for a directed verdict at the close of the evidence to question the sufficiency of the evidence through JNOV. Although courts construe strictly the requirement that a motion be made after a case-in-chief, they are generally more liberal about *what suffices as a motion* for a directed verdict after the close of all the evidence. Fed.R.Civ.P. 50(b) may be satisfied by an ambiguous or

13

inartfully made motion for a directed verdict or by an objection to an instruction for insufficient evidence to submit an issue to the jury" (emphasis added)).

*Go Daddy* provides more insight concerning how liberally Rule 50(a) arguments should be construed.  With regard to Go Daddy's Rule 50(b) argument that plaintiff had not engaged in protected activity, the court noted that its use, in the Rule 50(a) motion, of the term "alleged reports" could "be read as an attempt to maintain Go Daddy's position, presented through [the manager's] testimony, that [plaintiff] never registered any complaints about his treatment at Go Daddy. [The court went on to say, however, that] [t]he word 'alleged' . . . does not advance the argument that any reports Bouamama actually made were not protected activity."  581 F.3d at 962.  With respect to Go Daddy's argument that there was insufficient evidence to show plaintiff was terminated because of protected activity, the court noted that there were "two parts" to the argument – (1) that there was insufficient evidence the manager told her fellow panel members of plaintiff's reports of improper workplace behavior; and (2) that as a result, the reports could not have motivated the termination.  *Id*.  The court concluded that the second argument was a "logical extension" of the first, and that Go Daddy had therefore preserved this argument in its Rule 50(a) motion.  *Id*.[60]  The court thus evaluated Go Daddy's argument that the reports plaintiffs made were not protected activity under "the deferential plain error standard applicable to arguments not made in a Rule 50(a) motion."  It evaluated Go Daddy's argument that the manager had not advised other panel members of plaintiff's reports and thus those reports could not have motivated the termination under the substantial evidence standard applicable to arguments made in a Rule 50(a) motion.  *Id*. at 963.

---

[60]By contrast, the court held an argument that protected activity could not have motivated the termination because the discharge decision was made three days before the allegedly protected activity occurred had not been presented in Go Daddy's Rule 50(a) motion.  *Id*. at 962-63.  It evaluated this argument for plain error because it had not been raised in the Rule 50(a) motion.  *Id*. at 963.

In the present case, defendants advance the following arguments in their Rule 50(b) motion:

1.  There was insufficient evidence of contributory trademark infringement because:

   a.   there was no legally sufficient evidence of direct infringement, i.e., no evidence was adduced that the marks on the seized goods were identical to the marks on genuine Coach products. Specifically, no physical samples or photographs of the seized products were introduced at trial, and there was no testimony by a witness who saw the contents of the shipping container;[61]

   b.   the "continue to" element of contributory infringement was not proved because defendants committed only the single act of entering the goods into the United States, which amounted at most to negligent conduct;

   c.   the knowledge element of contributory infringement was not proved, because there was no evidence that anyone told defendants what was in the shipping container, and, as customs brokers, they lacked authority to inspect the container themselves before filing an application to enter it into the country.[62]

   d.   there was no evidence that defendants directly controlled and monitored the instrumentality used to infringe Coach's marks.[63]

2.  There was no evidence that the marks on the seized goods were likely to cause confusion, because the jury was not instructed on the "*Sleekcraft* factors" used to

---

[61]Rule 50(b) Motion at 5, 13.

[62]*Id.* at 15-20. Service providers like defendants are liable for contributory infringement if they intentionally induce another to infringe a trademark, or if they continue to supply their services to a primary infringer despite knowing or having reason to know that their services are being used to facilitate trademark infringement. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 853-54 (1982); *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 937, 942 (9th Cir. 2011); *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 983 (9th Cir. 1999).

[63]*Id.* at 20.

determine likelihood of confusion.  See *AMF Inc. v. Sleekcraft Boats*, 599 F.3d 341, 348-49 (9th Cir. 1979).[64]

3.    There was no legally sufficient evidence of false designation of origin – and thus contributory false designation of origin – because, without samples or photographs of the seized goods, there was no evidentiary basis upon which the jury could find a likelihood of confusion between the seized goods and genuine Coach goods.[65]

4.    There was no legally sufficient evidence of unlawful importation, because there was no evidence that the seized goods bore Coach's trademarks, that defendants dealt in the merchandise, or that they knew the shipment contained items bearing counterfeit Coach marks.[66]

5.    There was no legally sufficient basis for an award of statutory damages because there was no evidence of counterfeit marks that the jury could compare with the registered Coach marks, no evidence from which the jury could find the seized goods were likely to confuse, and no evidence of defendants' knowledge of the shipment's contents.[67]

---

[64]*Id.* at 11-12.

[65]*Id.* at 21.

[66]*Id.* at 22.  Under the Tariff Act, liability for unlawful importation is not limited to the importer, but extends to "[a]ny person dealing in" trademark-protected merchandise that is unlawfully imported into the United States. 19 U.S.C. § 1526; see also *Sebastian Int'l Inc. v. Russolillo*, 186 F.Supp.2d 1055, 1070-71 (C.D. Cal. 2000) ("Liability under [§ 1526] is not limited to the importer," citing *Houbigant, Inc. v. ACB Mercantile, Inc.*, 914 F.Supp. 964, 982 (S.D.N.Y.1995) (denying defendants' motion to dismiss because "[t]he complaint allege[d] that the [ ] defendants were responsible for and beneficiaries of an illegal scheme to sell counterfeit goods" even though they did not actually import the goods)); *Disenos Artisticos E Industriales, S.A. v. Work*, 676 F.Supp. 1254, 1272 (E.D.N.Y. 1987) ("[Section 1526] liability is not limited to importers only.  While subsection (a) bars importation and might be construed to apply only to importers, subsection (c) specifically provides a remedy against "[a]ny person dealing in any such merchandise").

[67]*Id.* at 23.

Defendants raised argument 1(a) in their Rule 50(a) motion because they asserted that no physical samples of the seized goods were introduced into evidence.  Analyzing defendants' arguments as *Go Daddy* directs, the court concludes that defendants' argument that other forms of evidence were lacking – specifically, photographs and testimony by individuals with personal knowledge – is a "logical extension" of the argument that Coach did not introduce exemplars of the seized handbags and wallets.  Just as the *Go Daddy* court construed references to an "alleged" report as an argument regarding the absence of evidence of any report, the court construes defendants' argument regarding the absence of physical exemplars of the seized goods as an argument that there was no evidence of any kind regarding the appearance of the infringing goods. The court will therefore consider defendants' argument regarding the absence of physical samples, photographs, or testimony concerning the appearance of the seized goods in deciding defendants' Rule 50(b) motion.

Each of arguments 1(b) and 1(d) concerns an element of contributory trademark infringement.  These arguments were not raised in defendants' Rule 50(a) motion in any way. Thus, they fall outside the scope of arguments properly considered under *Go Daddy*.  In *Go Daddy,* the court concluded that an argument that plaintiff's alleged reports to a manager could not have motivated the termination decision was a "logical extension" of a Rule 50(a) argument that there was insufficient evidence the manager told her fellow panel members of plaintiff's reports of improper workplace behavior.  This suggests that an argument is a "logical extension" of a second argument if it concerns a common issue, and one argument is dependent on the other. Arguments 1(b) and 1(d) concern elements of a contributory trademark infringement claim that are distinct from the element of infringement.  They are not logically related to that argument. Rather, the relationship between the arguments and those raised in defendants' Rule 50(a) motion is even more attenuated than the relationship between Go Daddy's reference to "alleged" reports and its later argument that any such reports did not constitute protected activity; as noted, the *Go Daddy* court found the latter argument was not a "logical extension" of the former, and reviewed that argument under the plain error standard.  *Id.* at 963.  Because arguments 1(b) and 1(d) are not "logical extensions" of arguments advanced in defendants' Rule 50(a) motion,  the court

concludes that they are not properly raised in defendants' Rule 50(b) motion, and it will not consider them.

The situation is somewhat different with respect to argument 1(c).  In their Rule 50(a) motion, defendants asserted there was no evidence that either of them knew of the infringer or the infringement.[68]  In its ruling on the motion, the court noted that the applicable standard is whether the defendant knew or should have known at the time services were provided that the person or entity obtaining the services would use them to infringe Coach's trademarks.[69]  Because the court construed defendants' Rule 50(a) argument as asserting a lack of evidence that defendants knew or should have known that their services were being used to infringe plaintiffs' trademarks, it concludes that argument 1(c) is properly raised in defendants' Rule 50(b) motion.

By contrast, defendants' second argument regarding failure to instruct the jury on the *Sleekcraft* factors is not "logically related" to any argument raised in their Rule 50(a) motion.  The relationship between the lack of evidence concerning the appearance of the seized goods and  jury instructions concerning likelihood of confusion is akin to the relationship between the content of a report and whether the report was ever made.  The *Go Daddy* court concluded that an argument based on the content of any reports made was not a logical extension of an argument that no reports were ever made.  Thus, the court will not consider this argument.

To the extent defendants' third,  fourth, and fifth arguments are based on a contention that there was no physical, photographic or testimonial evidence that the seized goods were infringing and that defendants lacked knowledge that the goods in the shipment infringed, these arguments were raised in defendants' Rule 50(a) motion,[70] and the court will consider them in deciding

---

[68]RT at 370:8-10.

[69]*Id.* at 370:11:15.

[70]The motion was not directed to specific causes of action, but generally to elements common to all causes of action.  (RT at 358:1-4 ("First of all, based on the evidence, . . . no infringing products was [sic] introduced or admitted, and so, therefore, the plaintiff will not be able to prove any infringement of their products"); *id.* at 385:5-9 ("The second reason is there is no evidence to show that the defendant – either defendant have [sic] any knowledge of who is the

defendants' Rule 50(b) motion.  Defendants' fourth argument also encompasses an assertion that there was no evidence defendants "dealt in" the infringing products, however.  This argument was not raised in the Rule 50(a) motion, and is not a logical extension of any of the arguments that were made.  Consequently, the court will not address it.  Defendants' fifth argument encompasses a claim that there was no evidence from which the jury could find that the seized goods were likely to create consumer confusion.  As this argument rests on defendants' contention that no evidence of the seized goods was admitted at trial, the court will consider it in deciding the Rule 50(b) motion.  The fifth argument also encompasses an assertion that there was insufficient evidence that defendants intended to use a counterfeit mark, because there was no evidence they had knowledge of what was in the shipping container.  As this argument rests on defendants' purported lack of knowledge that the goods in the shipment infringed. the court will consider it as well.

### 1.    Sufficiency of the Evidence of Infringing Products

Citing *Singh v. Gonzales*, 491 F.3d 1019, 1024 (9th Cir. 2007), and *Carolina Power & Light Co. v. Uranex*, 451 F.Supp.1044, 1055-56 (N.D. Cal. 1977), defendants argue that because Coach had the right to obtain a sample of the infringing goods on request from the CBP, physical evidence of the seized goods was under its control, and its failure to produce such evidence gives rise to an inference that the evidence was unfavorable to it.[71]  Coach counters there is no evidence that it ever had possession of or control over samples of the goods, or even that it had the opportunity to request samples of the goods before CBP destroyed them.[72]  Both *Singh* and *Carolina Power & Light* cite *International Union (UAW) v. N.L.R.B.*, 459 F.2d 1329 (D.C. Cir.

right infringer and what they plan to do, so, therefore, the elements of contributory infringement are not met").)  As noted, because defendants' argument that they lacked knowledge of the identity of the direct infringer misstated the legal standard, the court construed their argument as asserting that they neither knew nor should have known at the time services were provided that the person or entity using the services would use them to infringe Coach's trademarks.

[71]Rule 50(b) Motion at 5-6.

[72]Rule 50(b) Opp. at 19.

1972), in support of the proposition that when a party has relevant evidence within its control and fails to produce it, it is appropriate to infer that the evidence is unfavorable to that party.  In *International Union (UAW)*, the D.C. Circuit explained:

> "Simply stated, the rule provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him.  As Professor Wigmore has said: 'The failure to bring before the tribunal some circumstance, document, or witness, when either the party himself or his opponent claims that the facts would thereby be elucidated, serves to indicate, as the most natural inference, that the party fears to do so, and this fear is some evidence that the circumstance or document or witness, if brought, would have exposed facts unfavorable to the party.  These inferences, to be sure, cannot fairly be made except upon certain conditions; and they are also always open to explanation by circumstances which make some other hypothesis a more natural one than the party's fear of exposure.  But the propriety of such inference in general is not doubted.'"  *Id.* at 1336 (quoting 2 J. Wigmore, EVIDENCE § 285 (3d ed. 1940)).

The CBP destroyed all samples of the seized goods before Coach commenced this action.  Thus, this is not a case where it can be said that Coach had the evidence under its control at the time the action commenced.  Nor is there is any evidence that Coach deliberately delayed its filing of the action until CBP had destroyed the samples.

Moreover, although "a trial court also has the broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation [of evidence] against the party or witness responsible for that behavior," *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993), CBP, not Coach, was responsible for destruction of the seized items.  The negative inference is based on "'two rationales, one evidentiary and one not.'"  *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991) (quoting *Nation-Wide Check Corp. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 218 (1st Cir. 1982)).  The evidentiary rationale reflects "the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the

document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document." *Nation-Wide Check Corp.*, 844 F.2d at 1246. The other rationale is punitive – "[a] party should only be penalized for destroying documents if it was wrong to do so, and that requires, at a minimum, some notice that the documents are potentially relevant." *Akiona*, 938 F.2d at 161. Both of these rationales are undercut when someone other than the party against whom the inference is to be drawn discards or destroys the evidence. Accordingly, the rationales that support the adverse inference rule do not apply in this case.

The court also finds significant the fact Coach sought unsuccessfully at trial to admit photographs that it asserted depicted the seized items. Coach's in-house counsel, Lau,[73] testified that after CBP notified Coach of the seizure, Coach made a Freedom of Information Act request seeking documents and photographs in CBP's possession that pertained to the seized items.[74] Coach sought to admit certain photographs that Lau testified the company had received from CBP in response to its request and depicted the seized goods.[75] Defendants' counsel objected that Lau's assertion that the photographs depicted the seized goods was speculation; the court sustained this objection.[76] Coach then sought to examine Lau regarding his analysis of the photographs and what they showed regarding infringement.[77] The court ruled that the photographs were inadmissible because Lau could not authenticate them, as he neither made the FOIA request nor received the letter from the CBP, and had no personal knowledge that the photographs were of the seized goods.[78] It further ruled that, absent admission of the photographs, testimony by Lau concerning

---

[73]RT at 27:14-15.

[74]*Id.* at 140:13-143:17.

[75]*Id.*

[76]*Id.* at 143:18-21.

[77]*Id.* at 185:19-190:3.

[78]*Id.* at 241:9-242:15. The court noted that the photographs were inadmissible for the additional reason that they were photocopies, and Coach had not satisfied the best evidence rule by demonstrating that the originals had been lost or destroyed, or could not be obtained by

what they depicted was irrelevant.[79]   While the court did not accept Coach's evidentiary arguments, the fact that it attempted to introduce alleged photographs of the seized items, and was blocked from doing so by defendants' objections, demonstrates that it did not seek to keep information concerning the appearance of the seized goods from the jury such that an adverse inference should have been drawn.   Rather, the record clearly reflects that Coach believed evidence concerning the goods supported its claims and sought to present it.   Defendants, moreover, cannot both successfully object to the admission of purported photographic evidence of the seized goods and then benefit from its exclusion by arguing that Coach's failure to adduce evidence of the appearance of the seized goods warrants the drawing of an adverse inference against it.[80]

As noted, defendants do not confine their argument to the absence of physical samples of the seized goods.   Rather, they contend there was *no* evidence – either physical, photographic or testimonial – that the marks on the seized goods were counterfeit marks.   As a result, they assert, there was no basis on which the jury could have determined that the marks on the goods in the container were identical to the marks on genuine Coach products as depicted in photographs introduced at trial.[81]  As the court noted in denying defendants' Rule 50(a) motion, the record contained sufficient evidence from which a jury could reasonably have concluded the marks on the seized goods infringed the genuine Coach marks.   First, Coach introduced the CBP's Notice of Seizure, which stated that CBP had seized goods bearing a counterfeit mark.[82]  It reported that

---

available judicial process.  (*Id.* at 242:16-243:21.)

[79]*Id.* at 243:22-243:5.

[80]After the court sustained defendants' objections, Coach argued at some length why Lau should be permitted to testify regarding photographs.  (*Id.* at 243:8-249:19.)  Coach notes in its opposition to the Rule 50(b) motion that it intends to file a cross-appeal regarding the exclusion of the photographs in response to any appeal taken by defendants.  (Rule 50(b) Opp. at 15.)

[81]Rule 50(b) motion at 7.

[82]Watkins Decl., Exh. E (Trial Exh. 4).  Defendants argue the Notice of Seizure constitutes merely an *ex parte* finding by the CBP that has little effect on other tribunals and is not

the CBP had seized 22,040 handbags and 10,300 wallets bearing trademark 09-00492,[83] which corresponds to Coach's Horse and Carriage Trademark.[84]   While the Notice of Seizure is not determinative that the goods in question are counterfeit, see *Watkins v. Bureau of Customs and Border Protection*, 643 F.3d 1189, 1195 (9th Cir. 2011) ("Notices of Seizures are not final determinations that goods seized are counterfeit"), issuance of such a notice is some evidence of trademark infringement because it demonstrates that customs officials, who use the same test used by federal courts to determine infringement, concluded that the marks were counterfeit.   *United States v. Able Time, Inc.*, 545 F.3d 824, 830 (9th Cir. 2008) ("Customs has defined a 'copying or simulating' trademark as 'one which may so resemble a recorded mark or name as to be likely to cause the public to associate the copying or simulating mark or name with the recorded mark or name.'  19 C.F.R. § 133.22(a).  This is equivalent to the traditional 'likelihood of confusion' test for trademark infringement'"), cert. denied, 557 U.S. 936 (2009); 5 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 29:37 (4th ed. 2013) ("Customs regulations provide that an imported mark which is likely to be associated with a federally registered mark is deemed to 'copy or simulate' the registered mark.  This test is the same as that used to determine the infringement of a federally registered mark in ordinary litigation").

Second, Lau testified that the seized items were shipped in a container that also contained Gucci brand belts, even though Coach never ships goods in a container with another

---

determinative of whether goods are actually counterfeit.  (Rule 50(b) Motion at 7-8.)  Because defendants did not raise this argument in their Rule 50(a) motion, however, the court will not consider it in deciding their Rule 50(b) motion.  See *Go Daddy Software, Inc.*, 581 F.3d at 961.

[83]Watkins Decl., Exh. E (Trial Exh. 4).

[84]RT at 136:18-25; 157:7-11; Watkins Decl., Exh. E (Trial Exh. 40).

manufacturer's goods.[85]  This evidence too was probative of the counterfeit nature of the seized goods.

Lau further testified that photographs of genuine Coach products resembled the items seized by CBP:

"Q. Mr. Lau, would you please take a look at Exhibit 47. . . .

  A. Sure.

  Q. And can you tell me what those are?

  A. Those are images of authentic Coach product. Those are genuine Coach product

  that are in comparable style with the one that were seized by the Custom."[86]

Coach offered Exhibit 47, about which Lau had testified, and defense counsel objected that it was irrelevant.  The court overruled the objection and admitted the exhibit.[87]  After publishing the exhibit to the jury, the examination of Lau continued:

"Q. Okay.  Now, does this genuine handbag resemble the type of handbag you saw

  in the photographs that you obtained from Customs?

  A. Yes.

  Q. I'd like to show you the other photograph in Exhibit 47, Mr. Lau.  Can you tell

  us what that is?

  A. Sure.  This is another example of an authentic Coach wallet that is very similar

  to the one that were seized by the U.S. Custom in this case.

  Q. And can you also see the horse-and-carriage trademark on this?

---

[85]*Id.* at 329:7-331:12; Watkins Decl., Exh. E (Trial Exh. 5-3).  Defendants argue that Lau's testimony lacked foundation, was irrelevant, and was thus inadmissible.  (Rule 50(b) Motion at 8-9.)  Defendants did not raise these arguments in their Rule 50(a) motion or timely object at trial on this basis.

[86]RT at 143:23-144:4.  Defendants objected to this testimony as nonresponsive.  This objection was overruled.  (*Id.* at 144:5-6.)

[87]*Id.* at 144:17-18.

1   A. Sure.  It's also right in the middle.  Instead of a metal piece attachment it's

2   actually a stamp on the leather itself."[88]

3   By noting their similarity to genuine Coach products, Lau's testimony provided additional

4   evidence of the counterfeit nature of the seized goods.

5   Defendants argue Lau's testimony lacked foundation and was irrelevant, and that it was

6   insufficient to prove the seized goods bore counterfeit marks.  Specifically, they note that Lau did

7   not state the items seized by CBP were "identical" to genuine Coach products.[89]  Because

8   defendants neither objected to Lau's testimony as it was received on the grounds now advanced,

9   nor argued its insufficiency in their Rule 50(a) motion, the court will not consider this argument.

10   Defendants counter that the court must consider the admissibility of the testimony, citing

11   *Weisgram v. Marley, Inc.*, 528 U.S. 440, 457 (2000), and *Commodity Futures Trading Comm'n*

12   *v. Dizona*, 594 F.3d 408, 414 (5th Cir. 2010), for the proposition that in deciding a Rule 50(b)

13   motion, inadmissible evidence must be excised.[90]  In *Weisgram*, the Supreme Court held that an

14   appellate court can direct entry of judgment as a matter of law if it determines that, disregarding

15   erroneously admitted testimony, there is insufficient evidence to support the jury's verdict.  528

16   U.S. at 457.  In *Dizona*, the Fifth Circuit excised erroneously admitted hearsay evidence in

17   determining whether to affirm a district court's ruling on motions for judgment as a matter of law.

18   594 F.3d at 414.

19   Coach argues that *Weisgram* and *Dizona* deal only with the power of an appellate court to

20   excise improperly admitted evidence when reviewing a district court's ruling on a Rule 50(b)

21

22

23   [88]*Id.* at 145:19-146:7.  Counsel next asked Lau whether "this genuine product compare[s]

24   or look[s] similar to the product that you saw in the photographs that you obtained from

25   Customs?"  At this point, defense counsel objected that the question called for speculation; after colloquy with counsel outside the presence of the jury, the court sustained the objection.  (*Id.* at

26   146:9:17; 241:9-248:14.)

27   [89]Rule 50(b) Motion at 10-11.

28   [90]*Id.* at 4.

motion, and to direct entry of judgment as a matter of law in light of the remaining record.[91] Although *Weisgram* dealt with the power of a court of appeals to direct entry of judgment, the Court stated that lower court holdings that "courts confronting questions of judgment as a matter of law should rule on the record as it went to the jury, without excising evidence inadmissible under Federal Rule of Evidence 702 . . . are of questionable consistency with Rule 50(a)(1), which states that in ruling on a motion for judgment as a matter of law, the court is to inquire whether there is any 'legally sufficient evidentiary basis for a reasonable jury to find for [the opponent of the motion].'   Inadmissible evidence contributes nothing to a 'legally sufficient evidentiary basis.'"   528 U.S. at 453-54.  This statement, at a minimum, casts doubt on the propriety of a lower court's consideration of erroneously admitted evidence in determining whether to grant judgment as a matter of law.

Assuming *arguendo* that *Weisgram* requires that the court excise inadmissible evidence, it is of little assistance to defendants here.  This is because defendants failed timely to object to Lau's testimony regarding the similarity of the products seized by the CBP to genuine Coach products on the grounds they now assert.  Thus, defendants cannot now contend the evidence was erroneously admitted.  See *Karam v. Sagemark Consulting, Inc.*, 383 F.3d 421, 427 (6th Cir. 2004) ("*Weisgram* is probably not controlling on this issue because the defendant in *Weisgram* objected to the admission of the evidence in question.  Sagemark, in contrast, allowed the family members' testimony to be admitted without objection.  In the absence of a timely objection, such testimony is generally not considered to be 'erroneously admitted,'" citing FED.R.EVID. 103(a)(1) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the *specific ground of objection*, if the specific ground was not apparent from the context. . ." (internal citation omitted and emphasis added)); *Wilson v. Williams*, 182 F.3d 562, 567 (7th Cir. 1999) (stating that "Fed.R.Evid. 103(a)(1) . . . requires a litigant to state a specific ground for an objection to

---

[91]Rule 50(b) Opp. at 14.

evidence; grounds not presented cannot be raised later, else both judge and adversary are sandbagged (and preventable errors occur)").

As noted, defendants did not object to Lau's testimony on foundation or relevance grounds. They objected only that Lau's testimony was non-responsive – an objection the court overruled – and that photographs of genuine Coach products were not relevant, which the court also overruled. Defendants also objected, *after* the testimony in question had been given, that Coach's question called for speculation. Because defendants failed to assert a timely objection at trial to Lau's testimony on the grounds that it lacked foundation and was irrelevant, they cannot now assert that the testimony was erroneously admitted on those grounds. The court therefore concludes that there is substantial evidence in the record from which the jury could have found that the seized goods infringed. Defendants, therefore, are not entitled to judgment as a matter of law on the basis that Coach presented insufficient evidence that the seized goods infringed its trademarks.[92]

### 2. Evidence of Actual or Constructive Knowledge of Trademark Infringement

Defendants next argue there is insufficient evidence they knew, or had reason to know, of the trademark infringement.[93] After reviewing the evidence as a whole, the court concludes there is substantial evidence that could support a finding by reasonable jurors that defendants knew, or had reason to know, that the seized shipping container carried counterfeit or infringing products. As the court noted in denying defendants' Rule 50(a) motion, Wang received a power

---

[92]As noted, the court considers this argument in deciding whether defendants were entitled to judgment as a matter of law on Coach's contributory trademark infringement, false designation of origin, and unlawful importation claims, because each requires that Coach prove the seized goods infringed its trademarks. The court also considers the argument to the extent defendants contend that statutory damages were unavailable because there was insufficient evidence of infringement, and thus insufficient evidence that the counterfeit marks were likely to cause consumer confusion. Because the court finds that Coach adduced sufficient evidence to permit the jury to conclude that its trademarks were infringed, it concludes that each of these arguments fails to the extent premised on allegedly insufficient evidence of infringement.

[93]Rule 50(b) Motion at 15.

27

of attorney that had indicia of invalidity and, nonetheless, filed an entry form without conducting an inquiry to ensure the power of attorney was valid.  Coach also adduced expert testimony that the discrepancy in the name on the power of attorney rendered it invalid, and that Wang should have contacted Pierce Biotechnologies or taken other steps to verify the power of attorney before entering the goods.  There was also evidence that, after entering the goods, Wang took actions from which a reasonable jury could have inferred knowledge that she had engaged in wrongdoing.  Specifically, even though she personally filed the entry, Wang had a subordinate sign the entry form after being informed by the CBP that the container would likely be inspected.  There was also evidence introduced supporting an inference that Wang attempted to avoid the Customs agents when they came to her office; despite the fact that she is the sole owner of Celco, she did not meet with the agents, but eavesdropped on their conversation with a subordinate from the next room.  Furthermore, Wang's experience with a 2002 shipment of counterfeit Marlboro cigarettes supports an inference that she knew importers of counterfeit goods use fictitious powers of attorney to import the goods.  Taken as a whole, there is substantial evidence from which a reasonable jury could have found that Wang's act of filing an entry form that had clear indicia of invalidity, without seeking or receiving any information that explained inconsistencies in the power of attorney, demonstrated that she knew – or at a minimum, should have known – that her services were being used to facilitate trademark infringement.[94]

---

[94]At the hearing, defendants made several arguments as to why the evidence admitted at trial was insufficient to satisfy the knowledge element of contributory trademark infringement. First, they asserted that all other reported cases of contributory infringement involve notice to defendants, often through cease-and-desist letters.  Defendants have not cited any authority, and the court is aware of none, holding that notice is required.  Indeed, such a requirement seems at odds with the "knew or should have known" standard applicable to contributory infringement claims.  Even if there is such a requirement, however, there was sufficient evidence that defendants were on notice the shipment contained infringing products.  Coach's expert, Elon Pollack, testified about the importance of a valid power of attorney, which is the "written authorization that allows a corporation or an individual to transact customs business on behalf of an importer."  (RT 298:1-16; 299:2-7.)  He stated that transacting customs business without a valid power of attorney can expose a broker to a $10,000 fine per transaction and potentially the revocation of the broker's license.  (*Id.* at 302:18-24.)  He further testified that Customs has issued guidelines as to what brokers should do to verify the validity of a power of attorney.  (*Id.* at

Because the trial record contains substantial evidence from which a reasonable jury could conclude defendants knew or should have know that the goods in the shipment were infringing, the court denies defendants' motion for judgment as a matter of law on the basis that there was insufficient evidence they knew, or should have known, that the shipment contained counterfeit or infringing goods.[95]

---

299:2-9; 316:18-317-5.) He described standard industry practices a customs broker should follow when the name on a power of attorney does not match the name associated with the listed tax identification number; these include contacting the importer directly to verify its identity obtaining a power of attorney from the actual importer on whose behalf the broker will transact business if the company listed on the power of attorney is not the importer; filing the entry in the broker's own name; or walking away from the transaction. (*Id.* at 302:25-305:6.) There was thus a legally sufficient evidentiary basis for a reasonable jury to conclude that defendants, having many years of experience in the industry, were familiar with its practices, and that the fact that the name on the power of attorney was not associated with the listed tax identification number placed them on notice of the shipment's illegality. There was more than adequate evidence, moreover, that they *should have known* this discrepancy indicated the power of attorney was potentially invalid, and *should have known* that it was important to take various steps to verify that the transaction at issue was lawful. Nonetheless, they took none of them.

Defendants also argued at the hearing that the evidence admitted at trial was sufficient to place defendants, at most, on inquiry notice, but was insufficient to demonstrate constructive notice. Defendants did not explain the distinction they perceive between constructive and inquiry notice; they suggested, however, that inquiry notice fell short of the knowledge required to support a contributory trademark infringement claim. The court finds this argument unavailing. Courts often define inquiry notice as either conterminous with, or a subcategory of, constructive notice. See *In re Bick*, 874 F.2d 815, 1989 WL 41691, *2 (9th Cir. Apr. 19, 1989) (Unpub. Disp.) ("In other words, knowledge of facts sufficient to excite inquiry is constructive notice of all that the inquiry would have disclosed"); *In re Professional Inv. Properties of America*, 955 F.2d 623, 628 (9th Cir. 1992) ("Moreover, decisions such as *Probasco* discuss the trustee's notice requirement in terms of a constructive notice that encompasses inquiry notice"); *F.P. Baugh, Inc. v. Little Lake Lumber Co.*, 297 F.2d 692, 695-96 (9th Cir. 1961) ("A large segment of the brief of each party is devoted to constructive notice, implied actual notice and inquiry notice. We believe constructive notice includes the other two"); *In re Roman Catholic Archbishop of Portland in Or.*, 335 B.R. 868, 879 (Bankr. D. Or. 2005) ("[C]onstructive notice has long been made up of two different concepts: record notice and inquiry notice"); see also *In re Ryan*, 851 F.2d 502, 507 (1st Cir. 1988) ("[W]e do not believe 'inquiry notice' is a type of notice separate from 'actual' or 'constructive' notice. Rather, it is a corollary of both types").

[95]As noted, the court considers this argument in deciding whether defendants were entitled to judgment as a matter of law on Coach's contributory trademark infringement claim and its prayer for statutory damages. Because the court concludes that Coach adduced sufficient evidence

#### D.    Legal Standard Governing Motions for New Trial under Rule 59

Rule 59 provides, in pertinent part: "A new trial may be granted to all or any of the parties and on all or part of the issues . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States. . . ." FED.R.CIV.PROC. 59(a)(1).  As construed by the Ninth Circuit, "a new trial [under Rule 59(a)] may be ordered by the district court if, in its opinion, the jury's verdict was clearly contrary to the weight of the evidence." *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 668 F.2d 1014, 1027 (9th Cir. 1981).  See also *EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir. 1997) (a district court may order a new trial if it finds that the jury's verdict "is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result"); *Rattray v. City of Nat'l City*, 51 F.3d 793, 800 (9th Cir. 1994) (holding that the district court has discretion to grant a new trial when the jury's verdict is contrary to the "clear weight of the evidence" or based on false evidence, or when a new trial is needed to prevent a "miscarriage of justice" (citations and internal quotation marks omitted)); *Roy v. Volkswagen of America, Inc.*, 896 F.2d 1174, 1176 (9th Cir.), as amended, 920 F.2d 618 (9th Cir. 1990) (same).  Thus, unlike judgment as a matter of law, a new trial may be granted even where the record contains sufficient evidence to support the jury's verdict.  *Markovich v. Bell Helicopter Textron, Inc.*, 805 F.Supp. 1231, 1235 (E.D. Pa. 1992).  The decision to order a new trial lies within the sound discretion of the district court.  *Desrosiers*, 156 F.3d at 957.  See *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999) ("The trial court may grant a new trial, even though the verdict is supported by substantial evidence, if 'the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice'").

In ruling on a motion for new trial, the court may weigh the evidence and evaluate the credibility of witnesses.  See *Allred v. Maersk Line, Ltd.*, 826 F.Supp. 965, 971 (E.D. Va. 1993).

---

that defendants knew or should have known the seized shipment contained counterfeit or infringing goods, both arguments fail to the extent premised on an assertion that there was insufficient evidence defendants knew or should have known of the infringement.

Its review, however, is constrained by "[t]he fundamental principle . . . that there must be a minimum of judicial interference with the jury." 9A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, Civil 2d, § 2524 (4th ed. 2006).

### E.    Whether the Court Should Grant a New Trial

Defendants seek a new trial on four grounds. They contend a new trial is warranted because (1) the damage award is grossly excessive; (2) the verdict is against the clear weight of the evidence; (3) the jury instructions and verdict form were legally erroneous; and (4) a new trial is necessary to prevent a miscarriage of justice.[96]

### 1.    Whether the Verdict Was Against the Clear Weight of the Evidence

Defendants first argue that the jury's findings are against the clear weight of the evidence because there was no evidence the seized goods actually bore five counterfeited marks.[97] It is true that the jury was never shown the marks or the counterfeit products; the evidence of counterfeit marks adduced consisted of the Notice of Seizure and Lau's testimony regarding similarities between genuine Coach products and the seized goods.

---

[96]In their motion for new trial, defendants seek to incorporate by reference the entirety of the memorandum of points and authorities supporting their motion for judgment as a matter of law. (Rule 59 Motion at 5 n. 1.) Coach objects that such incorporation would allow defendants to exceed the 25 page limit on briefs set forth in Local Rule 11-6, and prejudice it by increasing the arguments to which it must respond in its opposition. (Opposition to Defendants' Motion for New Trial ("Rule 59 Opp."), Docket No. 164 (Oct. 3, 2013).) The court agrees that permitting defendants to incorporate by reference a separate brief would be unfair to Coach. See *Cirulli v. Hyundai Motor Co.*, No. SACV 08-0854 AG (MLGx), 2009 WL 5788762, *2 (C.D. Cal. June 12, 2009) ("Defendant makes a habit of incorporating filings related to its previous motion to dismiss the Second Amended Complaint. . . . A more cynical court might view this 'incorporation by reference' as a thinly-veiled attempt to make an end-run around the page limits set forth in Local Rule 11-6, which says that '[n]o memorandum of points and authorities . . . shall exceed 25 pages in length . . . unless permitted by order of the judge.' This Court will simply note that this practice of 'incorporation by reference' disregards the spirit of the Local Rules and is unfair to Plaintiff"). Accordingly, in deciding whether to grant a new trial, the court will consider only those arguments raised in defendants' Rule 59 motion and reply.

[97]Rule 59 Motion at 6.

Coach contends the Notice of Seizure constitutes substantial evidence that at least two counterfeit trademarks appeared on two different types of goods, justifying an award of up to $8 million in statutory damages.[98]   Under 15 U.S.C. § 1117(c) if the court finds that the use of a counterfeit mark was willful, a plaintiff may elect to recover statutory damages of "not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just."

Coach is correct that the Notice of Seizure indicates a counterfeit mark was found on two types of products – handbags and wallets.[99]   Coach contends the notice also indicates that each item bore two Coach marks.   Specifically, it asserts the notice indicated that each item bore the Horse and Carriage Trademark, which includes the word "Coach," a separately registered word mark.[100]   The Notice of Seizure, however, identified only a single mark.   Lau testified that the TMK number 0900492 listed on the Notice of Seizure referred to a trademark, not multiple trademarks.[101]   Lau explained that this trademark "is what we call a horse and carriage which is two horses and a buggy and then it says 'Coach' on the bottom."[102]   Plaintiff's Exhibit 40 is Registration Number 3,441,671 from the United States Patent and Trademark Office.   It depicts a horse and buggy graphic above the words "Coach Leatherware."[103]   Thus, the evidence showed that the trademark identified in the Notice of Seizure is a *single* mark that includes both a graphic

---

[98]Rule 59 Opp. at 14 n. 3.

[99]Watkins Decl., Exh. E (Trial Exh. 4).

[100]Rul 59 Opp. at 14.

[101]"Also, if you look at the first paragraph, it also indicate a –  what we call a TMK number which is 0900492.  That is a number that was assigned by the U.S. Customs when we give them our recordation of our trademark. They assign a number to our trademark. So that is our trademark that was recorded with Customs."  (RT at 136:3-8.)  Thus, Lau consistently referred to the Coach trademark in the singular.  Coach cites no testimony indicating that the Notice of Seizure identified the presence of multiple trademarks on the seized goods.

[102]*Id.* at 136:23-24.

[103]Watkins Decl., Exh. E (Trial Exh. 40).

and a word; it is not, as Coach contends in its opposition, two separate marks. Accordingly, the
Notice of Seizure supports an award of up to $4,000,000 in statutory damages under 15 U.S.C.
§ 1117(c), not $8,000,000 as Coach claims.

Coach also contends that, having seen photographs of the goods seized by CBP, Lau's
testimony that the genuine Coach handbag and wallet "resemble[d]," were "comparable in style,"
and were "very similar" to the handbags and wallets seized by CBP gave rise to an inference that
the seized items bore the same number and type of Coach trademarks as genuine Coach
products.[104]  Coach asserts each genuine handbag and wallet bears four registered trademarks,
only three of which are identical across the products, for a total of five trademarks.[105] Defendants
counter that Lau's testimony is insufficient to establish that the counterfeit goods bore five
different marks.[106]  Although Lau compared the appearance of the seized items to genuine Coach
products, he did not compare the trademarks on the goods nor any of their specific attributes.  It
is thus unclear whether his comparison was based on a specific number of trademarks, or on
other, non-trademarked design elements common to each product.  His statements regarding the
similar appearance of the two sets of products is minimal, if any, evidence supporting a verdict
that the seized goods infringed five of Coach's trademarks.  Because no other evidence was
admitted that would support such a finding, and because the evidence does not support a finding
that the goods comprised two types of products, each of which infringed two Coach trademarks,
the court concludes it is appropriate to grant a new trial.

### 2.    Contributory Infringement

Citing *Louis Vuitton Malletier*, 658 F.3d at 942, and *Viacom International, Inc. v.
YouTube, Inc.*, 940 F.Supp.2d 110 (S.D.N.Y. 2013), defendants argue that there was no evidence
introduced at trial that they "continued" to provide services to a direct infringer with actual or

---

[104]Rule 59 Opp. at 14-15.

[105]*Id*. at 15.

[106]Rule 59 Motion at 6.

constructive knowledge that counterfeit Coach goods were in the container.[107]  They contend this case is distinguishable from the typical case of contributory infringement, in which defendants lease real property or websites to retailers who sell infringing goods.[108]  Coach counters that Wang's actions in accepting and acting on a "patently invalid" power of attorney, and her efforts to "distance herself" from the power of attorney once she learned the goods had been seized, support the jury's conclusion that she "continued" to supply brokerage services after she knew those services were being used to further infringement.[109]  Defendants respond that in every other reported case of contributory infringement, evidence was adduced that defendants received cease-and-desist letters or other forms of notice, something which is not the case here.[110]

Defendants are correct that the cases they cite are factually distinguishable.   In *Louis Vuitton Malletier*, plaintiff sent defendants at least eighteen notices documenting trademark and copyright infringement on numerous websites they hosted; the notices demanded that defendants either remove the infringing content from their servers or require their customers to do so.  658 F.3d at 940.  Defendants were unable to identify any action they took in response to the notices, and the websites continued to operate using servers and IP addresses they owned.  *Id.* at 941.  The jury awarded $10,500,000 in statutory damages for willful contributory trademark infringement, and defendants moved for judgment as a matter of law.  *Id.*  Because they had continued their infringing conduct even after receiving numerous notices, defendants did not argue the construction of "continue to" on appeal, and the Ninth Circuit did not address whether receipt of notice of infringement was a necessary precondition to liability.

Defendants cite *Viacom* for the proposition that "[i]n imputing knowledge of the willfully disregarded fact, one must not impute more knowledge than the fact conveyed."  940 F.Supp.2d. at 116.  The *Viacom* court discussed willful blindness in the context of the safe harbor provision

---

[107]*Id.* at 6-7.

[108]*Id.* at 7.

[109]Rule 59 Opp. at 16.

[110]Rule 59 Reply at 10.

of the Digital Millennium Copyright Act (DMCA).  The court noted that more than 24 hours of new video is uploaded every minute to YouTube's website, and held that the DMCA did not require YouTube to locate infringing content on the website using proprietary search tools absent receipt of some information concerning the location of the infringing content.  *Id.* at 116-17 & n. 3.  Notably, the safe harbor provision of the DMCA places the burden of notifying service providers like YouTube of infringement on the copyright owner or his agent.  *Id.* at 114-15. Although the *Viacom* court noted that the concept of willful blindness continues to have relevance under the DMCA, see *id.* at 116 ("the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under the DMCA"), it defined what constituted willful blindness in light of the DMCA's safe harbor provision, as interpreted by the Ninth Circuit, and held that "what disqualifies the service provider from the DMCA's protection is blindness to 'specific and identifiable instances of infringement.'" *Id.*  Because this case does not involve the DMCA, *Viacom* does not control what constitutes willful blindness here.  The court concludes that facts placing defendants on notice that they had received an invalid power of attorney to enter goods into the United States at a minimum "impose[d] a duty [on them] to make further inquiries that a reasonable person would make . . . ." *Id.*

Moreover, the court disagrees that the "continue to" requirement can be satisfied only by assisting repeated instances of infringing conduct.  In its January 28, 2013 order granting in part and denying in part defendant's motion to dismiss, the court stated:

> "Although *Inwood* and other cases require that a defendant 'continue to supply . . . services to a primary infringer' before she can be held contributorily liable for trademark infringement, the 'continue to' language refers to continuation after the defendant knows or has reason to know that her services are being used to facilitate infringement.  There is nothing in *Inwood* or any other case that suggests that the 'continue to' language requires prior dealings between the defendant and the primary infringer, or prior involvement by defendant in an act of infringement. Pursuant to established law, defendants are liable for contributory trademark

infringement so long as they 'provided their services with actual or constructive knowledge that the users of their services were engaging in trademark infringement.' *Louis Vuitton*, 658 F.3d at 943; see also *Sony Computer Ent. Am, Inc. v. Gamemasters*, 87 F.Supp.2d 976, 985-86 (N.D. Cal. 1999) (citing *Gershwin Pub. Corp. v. Columbia Artists Mgm't*, 443 F.2d 1159, 1162 (2d Cir. 1971) ('[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer'))."[111]

Defendants also cite *Louis Vuitton Malletier*, 658 F.3d at 943 for the proposition that contributory trademark infringement requires specific knowledge of the counterfeit goods, not merely general knowledge that some kind of contraband is involved.[112]  The *Louis Vuitton Malletier* court did not discuss whether contributory infringement requires knowledge of specific infringing items, however.  Defendants cite *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010), for the proposition that generalized knowledge that imported goods are sometimes counterfeit is not sufficient to prove knowledge that the specific shipment at issue contained counterfeit Coach goods.  In *Tiffany*, the district court rejected Tiffany's argument that eBay was liable for contributory trademark infringement because Tiffany's notices to eBay of infringing activities gave it general knowledge of the sale of counterfeit Tiffany goods through its website, but did not identify which specific sellers were engaged in such conduct.  *Id.* at 107.  The Second Circuit agreed, holding that liability for contributory trademark liability requires knowledge that particular listings infringe, not simply general knowledge that the website is being used to sell counterfeit goods.  *Id.* *Tiffany*, however, is distinguishable.  The service defendants provided was not a website on which thousands of distinct users could offer goods for sale, some genuine and some infringing, and lacked knowledge as to which goods fell into which category.  Rather,

---

[111]Order Granting in Party and Denying in Part Defendants' Motion to Dismiss, Docket No. 61 (Jan. 1, 2013) at 17.

[112]Rule 59 Motion at 10-11.

defendants utilized a single invalid power of attorney to admit a specific shipment that they knew or should have known contained infringing goods.  These facts give rise to an inference of particularized knowledge that satisfies the *Tiffany* standard.

The court has already detailed the evidence from which a reasonable jury could have found that defendants had actual or constructive knowledge that the user of their services was engaging in trademark infringement.[113]  Consequently, the court denies defendants' motion for new trial based on insufficiency of the evidence that they "continued" to provide services to a primary infringer.

Defendants also argue there was no evidence that they directly controlled and monitored the instrumentality used to infringe Coach's marks.[114]  Coach counters that the infringing instrumentality was defendants' brokerage services, which they exclusively controlled and monitored.[115]  Citing *Lockheed Martin Corporation v. Network Solutions, Inc.*, 194 F.3d 980, 984-85 (9th Cir. 1999), defendants counter that serving as a customs broker is a nominal administrative service for which they cannot be held liable.[116]  In that case, Lockheed Martin asserted a contributory trademark infringement claim against Network Solutions, Inc. (NSI), the sole contractor for the National Science Foundation in charge of registering internet domain-names.  The claim was based on the registration of various domain-names utilizing variations of the words "Skunk Works," a registered service mark owned by Lockheed.  *Id.* at 982.  The Ninth Circuit stated that in analyzing contributory trademark infringement in the context of service providers, "we consider the extent of control exercised by the defendant over the third party's means of infringement."  *Id.* at 984.  It concluded that NSI had exercised insufficient control to support a finding of liability:

---

[113]See *supra* at 21.

[114]Rule 59 Motion at 7.

[115]Rule 59 Opp. at 16.

[116]Rule 59 Reply at 11.

"All evidence in the record indicates that NSI's role differs little from that of the United States Postal Service: when an Internet user enters a domain-name combination, NSI translates the domain-name combination to the registrant's IP Address and routes the information or command to the corresponding computer. Although NSI's routing service is only available to a registrant who has paid NSI's fee, NSI does not supply the domain-name combination any more than the Postal Service supplies a street address by performing the routine service of routing mail."

*Id.* at 984-85.

*Lockheed Martin* is inapposite. NSI receives more than 130,000 registrations per month, only ten percent of which are actually reviewed by an NSI employee. *Id.* at 982. NSI "does not consult third parties during the registration process, check for a registrant's right to use a particular word in a domain-name combination, or monitor the use of a combination once registered." *Id.* Celco, by contrast, processes just 4,600 to 4,700 transaction *per year*, each of which requires the involvement of its staff and, more importantly, receipt of a power of attorney to authorize entry of the shipment into the United States. Where, as in this case, the power of attorney appears invalid, a customs broker such as Celco has an obligation to verify its validity. The required use of a valid power of attorney for each transaction necessitates requires that a custom broker exercise "direct control and monitoring" over the shipments it enters into the United States. Thus, *Lockheed Martin*, in which defendant did not even review the vast majority of registrations, is distinguishable and does not control. Because the jury's finding that defendants exercised "direct monitoring and control" over the instrumentality used to infringe Coach's trademarks is not against the clear weight of the evidence, the court denies defendants' motion for new trial on this basis.

### 3.    Willfulness

Defendants next argue the jury's finding that defendants' conduct was "willful" is against the clear weight of the evidence.[117] They assert that a finding of willful misconduct under the

---

[117]Rule 59 Motion at 7.

Lanham Act must be supported by clear and convincing evidence.[118] The court's jury instructions on statutory damages identified the applicable burden of proof on willfulness as preponderance of the evidence.[119]  Defendants did not object to the instruction at trial.[120]  In fact, defendants proposed a jury instruction stating that the burden of proof on willfulness was preponderance of the evidence.[121]   Accordingly, defendants cannot now assert that the jury was improperly instructed concerning the applicable burden of proof.  See *Yeti by Molly, Ltd.*, 259 F.3d at 1109 (by failing to object at trial, a party waived its right to object post-trial to a jury charge and verdict form).

Even had the objection been preserved, moreover, it appears the appropriate standard is preponderance of the evidence.  In support of their argument that the clear and convincing standard applies, defendants cite *Tamko Roofing Products, Inc. v. Ideal Roofing Company, Ltd.*, 294 F.3d 227, 229 (1st Cir. 2002), *Versa Products Company, Inc. v. Bifold Company (Mfg.) Ltd.*, 50 F.3d 189, 208 (3d Cir. 1995), *Castrol, Inc. v. Penzoil Quaker State Company*, 169 F.Supp.2d 332, 341 & n. 8 (D.N.J. 2001), and *CollegeNet, Inc. v. XAP Corp.*, 483 F.Supp.2d 1058, 1065 (D. Or. 2007).[122]  As a threshold matter, *Tamko* does not accurately state the burden of proof on

---

[118]*Id.*

[119]Jury Instructions, Docket No. 129 (Mar. 28, 2013) at 25.

[120]See RT at 430:21-432:24.  Defendants raised the boilerplate objections to Coach's proposed instruction on statutory damages, asserting that the instruction was "improper, fail[ed] to state the law correctly, [was] inflammatory, and read[ ] as a closing argument."  They did not object to its reference to the preponderance of the evidence standard. (Proposed Jury Instructions, Docket No. 105 (Mar. 20, 2013) at 8.)  Moreover, defendants asserted that "[t]he proper instruction is [Ninth Circuit] Model Jury Instruction[s] 15.24 and 15.26." (*Id.*)  These model instructions each reference the preponderance of the evidence standard.  (Manual of Model Jury Instructions for the Ninth Circuit, 15.24, 15.26 (2007).)  Consequently, defendants did not raise or preserve this objection at trial.

[121]Proposed Jury Instructions, Docket No. 120 (Mar. 26, 2013) at 4.

[122]Rule 59 Motion at 7-8.

willfulness in the First Circuit.  In *Fishman Transducers, Inc. v. Paul*, 684 F.3d 187 (1st Cir.
2013), the court explained:

> "[T]his circuit noted in passing that the jury in [*Tamko Roofing*] found willfulness
> by clear and convincing evidence; but the burden of proof was not a disputed issue
> and our decision in *Tamko Roofing* did not adopt any standard.  The ordinary rule
> in civil cases is proof by a preponderance of the evidence, and the text of section
> 1117 does not prescribe a different burden of proof.  Fraud, a cousin to willfulness,
> has an historical association with the clear and convincing standard but the modern
> tendency in the Supreme Court is to reserve the clear and convincing burden, unless
> dictated by statute, for matters with constitutional implications like civil
> commitment. . . .  Authority in other circuits is divided on whether in Lanham Act
> cases to equate fraud or willfulness with a heightened standard of proof, but the
> modern guidance of [*Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 390
> (1983),] and [*Grogan v. Garner*, 498 U.S. 279, 291 (1991),] supports the ordinary
> preponderance standard where, as here, the statutory language does not call for
> more.  The omission of the term willful in the relevant portion of section 1117
> contrasts with its explicit use elsewhere in section 1117.  So, as a matter of first
> impression in this circuit, we think preponderance the proper standard." *Id.* at 192-
> 93 (internal citations omitted.)

The Fourth Circuit is in accord.  See *Harrods Ltd. v. Sixty Internet Domain Names*, 302
F.3d 214, 227 (4th Cir. 2002) ("[W]e conclude that the usual preponderance of the evidence
standard applies to claims of bad faith registration of domain names under § 1125(d)(1)").  See
also *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Management, Inc.*, 628
F.Supp.2d 312, 322-23 (E.D.N.Y. 2009) ("Finally, plaintiff's position on the applicable standard
of proof is correct as a matter of law.  The legislative history of the treble damages provision [15
U.S.C. § 1117(b)], as plaintiff notes, specifically discusses the preponderance standard: 'The
elements of proof in a civil suit under this Act will be the same as in a criminal prosecution: the
plaintiff must establish that the defendant intentionally trafficked or attempted to traffic in goods

1   or services knowing them to be counterfeit.  Of course, the standard of proof in a civil case will

2   be by a preponderance of the evidence, rather than beyond a reasonable doubt,'" citing S. Rep.

3   No. 98-526, at 2 (1984)); but see *Versa Prods. Co.*, 50 F.3d at 207-08 ("[W]e hold that in the

4   product configuration context, a defendant's intent weighs in favor of a finding of likelihood of

5   confusion only if intent to confuse or deceive is demonstrated by clear and convincing evidence,

6   and only where the product's labeling and marketing are also affirmatively misleading").

7        The only case from this circuit cited by defendants in which the court adopted the clear and

8   convincing standard– *CollegeNet, Inc.* – did so without analysis, citing *Tamko*, *Versa*, and a

9   district court case from the Third Circuit, *Castrol, Inc. v. Pennzoil Quaker State Co.*, 169

10  F.Supp.2d 332, 341 & n. 8 (D.N.J. 2001).  As noted, the First Circuit has since explained that

11  *Tamko* did not adopt the clear and convincing standard; it has, moreover, expressly repudiated use

12  of such a standard in *Fishman Transducers*.  More importantly, because the *CollegeNet* court did

13  not articulate why it was adopting the clear and convincing standard, the case has little persuasive

14  value.  Defendants cite no other pertinent authority, and it therefore appears the burden of proof

15  with respect to willfulness under the Lanham Act is preponderance of the evidence.

16       Applying the preponderance standard, the court concludes the jury's finding that defendants

17  acted willfully is not against the clear weight of the evidence.  As noted, Wang received a power

18  of attorney that had indicia of invalidity, yet filed an entry form without conducting any

19  investigation to ensure it was valid.[123]  There was expert testimony that Wang should have

20  contacted Pierce Biotechnologies to verify the power of attorney.  Moreover, after entering the

---

22  [123]Defendants argue that Wang sought confirmation of the identity of the importer by
23  communicating with the freight forwarder, and that defendants' contract with the freight forwarder
    required that it not attempt to contact the importer.  (Rule 59 Motion at 10).  Pollack, Coach's
24  expert, testified that it is unlawful for a customs broker to enter into an agreement with a freight
    forwarder requiring that it not contact the importer directly.  (RT 283:20-284:8.)  Pollack also
25  testified that contacting the freight forwarder rather than the importer to obtain a new power of
    attorney that reflected the name actually associated with the tax identification number was unlikely
26  to be effective. (RT 284:9-15.)  Based on this testimony, the jury was entitled to conclude that
    Wang's contact with the freight forwarder was neither an effective attempt to determine the
27  validity of the power of attorney nor a reasonable step to ensure that her services were not being
28  used to assist entry of a shipment of infringing goods.

goods into the United States, Wang engaged in behavior from which a reasonable jury could have inferred that she knew she had engaged in wrongful conduct: she had a subordinate sign the entry form and attempted to avoid Customs agents when they came to her office.   This evidence supports an inference that Wang acted with willful blindness to Coach's rights.   See *Philip Morris USA v. John x. Liu*, 489 F.Supp.2d 1119, 1123 (C.D. Cal. 2007) ("Willfulness can be established by evidence of knowing conduct or by evidence that the defendant acted with 'an indifference to plaintiff's rights' – in other words, that defendant willfully blinded himself to facts that would put him on notice that he was infringing another's trademarks, having cause to suspect it"); *id.* ("To be willfully blind, a person must suspect wrongdoing and deliberately fail to investigate," citing *Hard Rock Café Lic. Corp. v. Concession Servs.*, 955 F.2d 1143, 1149 (7th Cir. 1992)). Accordingly, the jury's finding that defendants engaged in willful conduct is not against the clear weight of the evidence.

### 4.   Statutory Damages Award

Defendants argue that even if the court determines that a factual basis for an award of statutory damages exists, the magnitude of the award alone warrants granting a new trial.[124] "Beyond obvious bias or passion, a verdict will also not be sustained on appeal if it is 'grossly excessive' or 'monstrous.'" *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1115 (9th Cir. 2012) (citing *Plumbers & Steamfitters Union, Local No. 598 v. Dillion*, 255 F.2d 820, 824 (9th Cir. 1958)).   See also *Innes v. Maritime Overseas Corp.*, 33 Fed. Appx. 282, 283-84 (9th Cir. Mar. 20, 2002) (Unpub. Disp.) ("MOC finally contends that a new trial should be granted because Innes's damage award is excessive.   The jury's finding of the amount of damages must be upheld unless the amount is 'grossly excessive or monstrous'"); *Honua Technologies, Inc. v. Krugthep Thanakom, Co.*, No. 05–00523–BMK, 2007 WL 1655811, *1 (D. Haw. June 5, 2007) ("In the Ninth Circuit, damage awards are disturbed only when 'the amount is grossly excessive or monstrous.'   If the damages award is grossly excessive, the Court may either grant a motion for a new trial or give the prevailing party the option of accepting a reduced amount of damages in

---

[124]*Id.* at 11.

lieu of holding a new trial on damages," citing *Lambert v. Ackerly*, 180 F.3d 997, 1011 (9th Cir. 1999)).

Defendants argue that there was no evidence at trial of actual damages.[125]  "Although § 1117(c) does not provide guidelines for determining an appropriate statutory damages award, 'courts faced with determining statutory damages under the Act have analogized to the body of case law interpreting a similar provision in the Copyright Act.'"  *Sennheiser Electronic Corp. v. Eichler*, No. CV 12–10809 MMM (PLAx), 2013 WL 3811775, *7 (C.D. Cal. July 19, 2013) (quoting *Philip Morris USA, Inc. v. Castworld Prod., Inc.*, 219 F.R.D. 494, 499 (C.D. Cal. 2003)).  In determining the appropriate amount of statutory damages to award, a court should "'consider the defendant's profits, as well as saved expenses, the plaintiff's lost revenues, and the defendant's state of mind."[126]  *Rolex Watch U.S.A., Inc. v. Zeotec Diamonds, Inc.*, No. CV 02–01089 GAF (VBKx), 2003 WL 23705746, *4 (C.D. Cal. Mar. 7, 2003)).  The resulting statutory damage award should be "low enough to bear some rational relationship to the amount of damages incurred . . . but substantial enough to deter similarly situated businesses from engaging in similar conduct in the future.'"  *Id.* at *5.  Nonetheless, the Supreme Court has held that the deterrence of future infringement is an important factor in determining statutory damages under the Copyright Act, and thus the amount of statutory damages need not be limited to the amount of a plaintiff's actual damages.  *Castworld Products, Inc.*, 219 F.R.D. at 501.  As the Court explained:

---

[125]*Id.*

[126]Some courts have employed a seven-factor test in determining the appropriate amount of statutory damages under the analogous provision of the Copyright Act.  These factors include: (1) the expenses saved and the profits reaped by the defendant; (2) the revenues lost by the plaintiff; (3) the value of the copyright; (4) the deterrent effect on persons other than the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether the defendant cooperated in providing records that can be used to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant.  See, e.g., *Coach, Inc. v. Am. Fashion Gift*, No. CV 12–07647 MWF (RZx), 2013 WL 950938, *2 (C.D. Cal. Mar. 12, 2013); *Chanel, Inc. v. Dudum*, No. C 12–01966 JCS, 2012 WL 5833562, *7 (N.D. Cal. Oct. 29, 2012).

"The statutory rule, formulated after long experience, not merely compels restitution for profit and reparation for injury but also is designed to discourage wrongful conduct. The discretion of the court is wide enough to permit a resort to statutory damages for such purposes. Even for uninjurious and unprofitable invasions of copyright the court may, if it deems just, impose a liability within statutory limits to sanction and vindicate statutory policy." *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233 (1952).

In awarding statutory damages, courts consider the infringer's profits, and whether the infringer offered the goods for sale, or simply permitted a direct infringer to use their property to sell the counterfeit goods; if the latter, typically lower statutory damages are awarded. In *Coach, Inc. v. Cellular Planet*, No. 2:09–cv–00241, 2010 WL 2572113, *3 (S.D. Ohio June 22, 2010), a case cited by defendants, the court awarded $100,000 in statutory damages for each infringement against defendants who sold counterfeit Coach products, and $10,000 per violation against the Marathon YMA, which willfully infringed Coach's marks by allowing the counterfeit goods to be sold at its premises. The court explained:

"An award of $100,000 for each infringement is appropriate as to defendants Kingdom Fashions, Hamid Arafat, and Mohammed Abdallah. Marathon YMA is in a different posture, because it did not offer the infringing goods for sale, but instead permitted Diallo to sell counterfeit goods on its property. There is no evidence that Marathon YMA more than nominally profited from permitting Diallo's infringing conduct. Nonetheless, Marathon YMA damaged Coach." *Id.*

In other cases involving willful infringement of trademarks, moreover, courts have awarded damages substantially below those awarded by the jury in this case. See *Sweet People Apparel, Inc. v. Zipper Clothing*, No. CV 12–02759–ODW (CWx), 2012 WL 1952842, *4-5 (C.D. Cal. May 31, 2012) (awarding $150,000 for each of two counterfeit marks, for a total of $300,000); *Coach, Inc. v. Diva Shoes & Accessories*, No. 10–5151 SC, 2011 WL 1483436, *6, 8 (N.D. Cal. Apr. 19, 2011) (awarding a total of $140,000 for four counts of willful infringement).

Coach asserts that the large quantity of infringing merchandise involved in this case merits a significant statutory damages award.  It is true that some courts have awarded the maximum amount of statutory damages in cases involving seizures of large quantities of counterfeit goods worth millions of dollars.  In *Castworld Products*, the CBP seized 8,000,000 counterfeit cigarettes, with a street value of millions of dollars, at the Port of Los Angeles.  *Id.* at 497, 501.  Plaintiff alleged that the sale and distribution of the counterfeit cigarettes would have been imminent but for Customs' seizure.  *Id.* at 497.  On default judgment, the court awarded $2,000,000 in statutory damages, the maximum amount then available under 15 U.S.C. § 1117(c).  *Id.* at 502.  In determining the appropriate amount to award, the court noted plaintiff's desire to deter the defendant as well as other similarly situated importers.  *Id.* at 501.  Similarly, in *Philip Morris USA, Inc. v. Sheng Chen Lin*, No. CV–03–08923 CAS (MCx), 2004 WL 5582505, *7 (C.D. Cal. Oct. 25, 2004), a case in which the CBP seized 6,190,000 cigarettes from defendant, the court awarded the maximum statutory damages then available under § 1117(c) – $4 million based on four infringements.

Other courts, however, have awarded statutory damages significantly below the maximum even where large qualities of infringing products were involved.  See, e.g., *Coach, Inc. v. Allen*, No. 11 Civ. 3590(CM)(FM), 2012 WL 5359579, *3 (S.D.N.Y. July 20, 2012) (magistrate judge recommending a statutory damages award of $200,000 for each of 11 counts of willful infringement, where defendant intended to distribute large quantities of counterfeit Coach goods); *Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc.*, No. CV 08–0068(KAM)(JO), 2010 WL 2133937, *17 (E.D.N.Y. Mar. 11, 2010), report and recommendation adopted by 2010 WL 2160058 (E.D.N.Y. May 27, 2010) (awarding statutory damages of $90,000 for a willful violation involving 3,950 cartons of counterfeit cigarettes, where the CBP seized the counterfeit goods prior to their distribution).

Still other courts have awarded the maximum without multiplying that figure by the number of infringing marks.  See *Rolex Watch U.S.A., Inc. v. Brown*, No. 01 Civ. 9155 JGK AJP, 2002 WL 1226863, *2 (S.D.N.Y. June 5, 2002) (magistrate judge recommending a $1 million maximum statutory damage award, without multiplication for multiple infringed Rolex marks,

1   where there was no evidence of the number of infringing items sold, but the court assumed the

2   sale of 10,000 watches); *Louis Vuitton Malletier and Oakley, Inc. v. Veit*, 211 F.Supp.2d 567, 585

3   (E.D. Pa. 2002) ("In similar cases concerning multiple marks, courts have been inclined to either

4   award the maximum without multiplication or to lower the per mark award.  I agree with this

5   logic.  While this case certainly calls for a high damage award, given the egregious conduct of the

6   Defendants and the use of the internet, I conclude that a total award of $1,000,000 for the six

7   Louis Vuitton marks and an award of $500,000 for the two Oakley marks ensures the dual

8   objectives of compensating Plaintiffs and deterring Defendants" (internal citations omitted)).

9        This case involved the seizure of a significant quantity of counterfeit merchandise with a

10  potentially high street value; it is likely that sale of the merchandise would have been imminent

11  but for its seizure by the CBP.  Coach suggests that in light of these facts, the jury may well have

12  awarded substantial damages to punish and deter defendants from future acts of infringement.[127]

13  Nonetheless, like Marathon YMA in *Cellular Planet*, 2010 WL 2572113 at *3, defendants did not

14  stand to profit from the sale of the infringing merchandise and received a minuscule fee for

15  entering the goods into the United States.  While willful conduct of the type the jury found needs

16  to be deterred, and while defendants' actions could well have damaged Coach but for the

17  intervention of the CBP, the fact is that they did not.  Given defendants' role, the lack of any

18  actual damages, and the fact that defendants received a small fee for entering the goods and would

19  not have shared in any profits made from selling them, awarding maximum statutory damages

20  appears excessive.

21       There is no indication, however, that the jury was motivated by bias, passion or sympathy.

22  See *Skydive Arizona, Inc.*, 673 F.3d at 1115 (stating that this provides a basis for granting a new

23  trial).  Nor, although it finds the award excessive for the reasons articulated above, can the court

24  say it is "grossly excessive" or "monstrous."  *Id.* ("However, in assessing whether a damages

25  award is grossly excessive, '[t]he fact that the jury may have agreed with [the plaintiff's expert]

26  and rejected the defendant's contentions . . . does not render the verdict 'grossly excessive or

27  _____

28       [127]Rule 59 Opp. at 11.

monstrous.'"  *Id.* (quoting *Hemmings v. Tidyman's, Inc.*, 285 F.3d 1174, 1191 (9th Cir. 2002)). The court would find it inappropriate to take that verdict away and grant a new trial were its size the only reason to do so.  As noted *infra*, however, infirmities in the verdict form that relate directly to the jury's statutory damages award warrant a new trial.[128]

Citing the Supreme Court's decisions in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), and *State Farm Mutual Auto Insurance Company v. Campbell*, 538 U.S. 408 (2003), defendants also argue the damages award violates their due process rights.[129]  Coach correctly counters that these cases do not set forth the standard for evaluating whether statutory damage awards violate due process rights.  Rather, that standard is found in *St. Louis. I.M. & S. Railway*

---

[128]At the hearing, Coach argued that the court should afford it the opportunity to accept a remittitur in lieu of a new trial.  "The Court has discretion to grant a remittitur, reducing the damages to the maximum authorized under the evidence, and then offer Plaintiffs the choice of accepting a remittitur (a reduction) of the award in lieu of a new trial on the issue of the damages only."  *Dixon v. City of Coeur d'Alene*, No. 2:10–cv–00078–LMB, 2012 WL 2923149, *8 (D. Idaho July 18, 2012) (citing *Morgan v. Woessner*, 997 F.2d 1244 (9th Cir. 1993), and *Munguia v. Grelyn of Maui, LLC*, No. 09–00058 HG-BMK, 2011 WL 1364026, *26 (D. Haw. Apr. 8, 2011)).  A jury's damages award, however, is generally "entitled to great deference," and "should be upheld unless it is clearly not supported by the evidence or only based on speculation or guesswork."  *In re First Alliance Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006); see *Del Monte Dunes at Monterey, Ltd. v. Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996) (jury's damages verdict must be upheld unless it is "grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guess work").  See also *DSPT Intern., Inc. v. Nahum*, 624 F.3d 1213, 1224 (9th Cir. 2010) (stating that courts must uphold damages verdicts "whenever possible, and all presumptions are in favor of the judgment," quoting *Bouman v. Block*, 940 F.2d 1211, 1234 (9th Cir. 1991)); *Currier v. United Technologies Corp.*, 393 F.3d 246, 256 (1st Cir. 2004) (a party "seeking remittitur bears a heavy burden of showing that an award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand" (internal quotation marks and citation omitted)); *In re Exxon Valdez*, 270 F.3d 1215, 1247-48 (9th Cir. 2001) ("A jury's damages verdict is entitled to 'substantial deference' and must be upheld unless it is 'clearly unsupported by the evidence,'" quoting *Stinnett v. Damson Oil Corp.*, 813 F.3d 1394, 1398 (9th Cir. 1987)).  Although the court has determined that the damages award was not "grossly excessive" or "monstrous," it has found that the verdict was not supported by the evidence.  Nonetheless, it concludes that offering Coach the choice of a remittitur is not appropriate given the infirmities in the verdict form discussed *infra*.

[129]Rule 59 Motion at 18, 20.

*Company v. Williams*, 251 U.S. 63 (1919).[130]  See *Perez-Farias v. Global Horizons, Inc.*, 499 Fed. Appx. 735, 737 (9th Cir. Dec. 5, 2012) (Unpub. Disp.) (quoting *Williams* in holding that a statutory damages award did not violate due process because it was not "'so severe and oppressive as to be wholly disproportioned [sic] to the offense and obviously unreasonable'" (alteration original)); *United States v. Citrin*, 972 F.2d 1044, 1051 (9th Cir. 1992) (applying *Williams* to determine if a statutory damages award violated due process); *Verizon California Inc. v. Onlinenic, Inc.*, No. C 08–2832 JF (RS), 2009 WL 2706393, *6 (N.D. Cal. Aug. 25, 2009) ("[I]t is highly doubtful whether *Gore* and *Campbell* apply to statutory damages awards at all. Like the Sixth Circuit, this Court 'know[s] of no case invalidating . . . an award of statutory damages under *Gore* or *Campbell*,'" quoting *Zomba Enterprises, Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 587 (6th Cir. 2007)).

Under *Williams*, "[a] statutorily prescribed penalty violates due process rights 'only where the penalty prescribed is so severe and oppressive as to be wholly disproportion[ate] to the offense and obviously unreasonable.'"  *Citrin*, 972 F.2d at 1051 (quoting *Williams*, 251 U.S. at 66-67). See *Arrez v. Kelly Services, Inc.*, 522 F.Supp.2d 997, 1008 (N.D. Ill. 2007) ("In determining whether the penalty is grossly disproportionate, 'the fine need only bear some relationship to the offense's gravity; this is not a proportionality inquiry'" (citation omitted)).  Thus, the award does not violate defendants' due process rights simply because it is not proportional to the actual harm Coach suffered.  See *Centerline Equip. Corp. v. Banner Personnel Serv., Inc.*, 545 F.Supp.2d 768, 777 (N.D. Ill. 2008) (rejecting defendant's argument that a 30,000:1 ratio between potential statutory damages and the actual harm plaintiff suffered would violate due process since "[t]here is no requirement that the statutory remedy be proportional to the plaintiff's own injury [and] . . . Congress may choose an amount that reflects the injury to the public as well as to the individual," citing *Williams*, 251 U.S. at 66).

In their reply, defendants argue that the $8 million statutory damages award is unconstitutional even under *Williams*, because they received no warning regarding their conduct,

---

[130]Rule 59 Opp. at 21.

such as a cease-and-desist letters or court order.[131]   They cite no cases in which courts have found statutory awards violated due process, however.

Having already determined a new trial is necessary to determine the number of infringements, and deciding *infra* that problems with the verdict form also warrant a new trial, the court need not decide this issue.   It therefore declines, under the constitutional avoidance doctrine, to determine the constitutionality of the damages award.   See *Sony BMG Music Entertainment v. Tenenbaum*, 660 F.3d 487, 508 (1st Cir. 2011) (holding that the district court committed reversible error when it bypassed the issue of common law remittitur and instead decided whether a jury's award violated due process, as it contravened the rule of constitutional avoidance because resolution of the constitutional question was neither necessary nor inevitable, and had considerable impermissible consequences).

Defendants also take issue with the manner in which the verdict was calculated.[132]   They argue the $8 million judgment against Celco and Wang is erroneous, because it awards statutory damages of $4 million against each of two defendants who engaged in identical conduct.[133] Defendants cite *Louis Vuitton Malletier* for the proposition that damages for contributory trademark infringement cannot be multiplied by the number of defendants held liable.   In *Louis Vuitton Malletier*, the court vacated an award of statutory damages in a copyright and trademark infringement case, because the jury awarded statutory damages against each defendant which, the Ninth Circuit concluded, amounted to an impermissible double award.   658 F.3d at 946-47.   The court explained that "15 U.S.C. § 1117(c) entitles a plaintiff to an award, not multiple awards." *Id*.   It noted that "[w]here the infringements of one work were committed by a single infringer acting individually, a single award of statutory damages would be made.   Similarly, where the

---

[131]Reply in Support of Motion for New Trial, Docket No. 167 (Dec. 26, 2013) at 18.

[132]Defendants make this argument in support of amendment of the judgment if the court denies both their motion for judgment as a matter of law and new trial.   (Rule 59 Mot. at 23.) Although it has determined that a new trial must be granted, the court addresses the issue here to provide guidance to the parties in future proceedings.

[133]*Id*.

work was infringed by two or more joint tortfeasors, the bill would make them jointly and severally liable for an amount in the [statutory] range." *Id.* at 946 (quoting 17 U.S.C. § 504, Notes of Committee on the Judiciary, H.R.Rep. No. 94–1476, 1976 U.S.C.C.A.N. 5659 (1976)); see also *id.* at 947 ("With respect to damages for contributory trademark infringement, logic compels the same result [between] 17 U.S.C. § 504(c) and 15 U.S.C. § 1117(c)"). The court held that the district court erred in permitting the jury to make separate awards against each of the two defendants. It stated: "The verdict form invited the jury to specify a separate statutory damage award against each defendant, and then to calculate the total amount of the award for copyright damages. In the absence of further guidance explaining the statutory requirement, this was error. There was no legal basis for multiplying the award by the number of defendants." *Id.*

Coach argues *Louis Vuitton Malletier* is distinguishable, because in that case, when the awards against each defendant were combined they exceeded the statutory maximum. Here, by contrast, the $8 million verdict is below the statutory maximum.[134] While the court agrees that the amount of the award in *Louis Vuitton Malletier* made the duplicative nature of the judgment obvious, the Ninth Circuit's holding is not limited to cases in which duplicative judgments exceed the statutory maximum set forth in § 1117(c). Here, the verdict form invited the jury to make a separate statutory damage award against each defendant. Question 26 stated: "Please specify below the total amount of statutory damages to be awarded against Celco. You can award not less than $1,000 nor more than $2,000,000 for each mark infringed, for each type of good, not to exceed $16,000,000."[135] Question 30 gave a similar direction respecting Wang.[136] Neither the verdict form nor Jury Instruction No. 19, which concerned damages, included any language directing the jury that it could make only a single award for joint infringement by Celco and

---

[134]Rule 59 Opp. at 25.

[135]Redacted Verdict Form at 11-12.

[136]*Id.* at 13.

Wang.[137]  "In the absence of further guidance explaining the statutory requirement" that the jury could make only a single award, the verdict form invited error.  658 F.3d at 946.

Coach is correct that the total award of $8 million is within the statutory maximum; it is, moreover, the precise amount it sought in closing argument.  The verdict form, however, does not specify the per-infringement damages the jury awarded.  While it is possible that the jury made a single award of $8 million ($1 million for each of eight alleged infringements), and apportioned half of the total award to each defendant, it is equally possible that the jury found damages of $500,000 per infringement, but awarded the total amount of $4 million once against Wang and a second time against Celco.  *Louis Vuitton Malletier* therefore requires a new trial.

### 5.    Jury Instructions and Verdict Form

Defendants next assert that a new trial is warranted based on errors in the jury instructions and verdict form.  They contend Jury Instructions Nos. 15 and 17 incorrectly state the elements of claims for contributory trademark infringement and contributory false designation of origin, respectively, because they fail to include the requirement that a defendant "continue to" supply services to one it knows or has reason to know is engaged in trademark infringement or false designation of origin.[138]  The court gave the Ninth Circuit's Model Instruction No. 15.19, which does not include any reference to "continuing to" supply services to an infringer that a defendant knows or should know will use its services to infringe plaintiff's trademark .  The language of the instruction, moreover, comes directly from *Louis Vuitton Malletier*, 658 F.3d at 942 ("Plaintiffs asserting contributory trademark infringement claims must prove that defendants provided their services with actual or constructive knowledge that the users of their services were engaging in trademark infringement").  In the context of this case, the court concluded that this language best conveyed the nature of the proof Coach had to present and that a reference to "continuing to"

---

[137]The *Louis Vuitton Malletier* court stated that, "where separate infringements for which two or more defendants are not jointly liable are joined in the same action, separate awards of statutory damages would be appropriate."  658 F.3d at 946.  In this case, defendants are jointly and severally liable, and separate statutory damages awards are not appropriate.

[138]Rule 59 Opp. at 21.

provide services would invite the jury to examine whether there was evidence that defendants had previously provided services to the shipper or importer of the container when there was no requirement that they have done so.  The court is not persuaded that giving this instruction was error.

Even it is was, however, Coach argues that it is at most harmless error under Rule 61 of the Federal Rules of Civil Procedure because there was sufficient evidence adduced at trial to satisfy the element.[139]  Rule 61 provides:

> "Unless justice requires otherwise, no error in admitting or excluding evidence – or any other error by the court or a party – is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order.  At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."
>
> FED.R.CIV.PROC. 61.

The court agrees with Coach.  As noted earlier, the "continues to" element does not require that there have been prior dealings between defendants and the direct infringer, but only that defendants "provided their services with actual or constructive knowledge that the users of their services were engaging in trademark infringement."  *Louis Vuitton Malletier*, 658 F.3d at 943. In light of Wang's failure to confirm the validity of the flawed power of attorney, the court cannot say that the jury's verdict was against the clear weight of the evidence, or that the giving of Instructions Nos. 15 and 17 affected defendants' substantial rights.

Defendants also argue the instructions failed to advise the jury that they had to have had direct control and monitoring over the instrumentality that caused the infringement or false designation of origin.[140]  As Coach notes, defendants objected to the jury instructions it proposed concerning the elements of contributory trademark infringement and contributory false designation of origin.  Each of the proposed instruction included as an element that "the Defendants had direct

---

[139]*Id.* at 23.

[140]*Id.* at 21.

control and monitoring of the services that they provided to 'Robert Laurance.'"[141] Moreover, defendants did not object to the omission of this language from the court's final instructions.[142] They thus waived any objection to the instructions on this basis. See *Yeti by Molly, Ltd.*, 259 F.3d at 1109; *El-Hakem v. BYJ Inc.*, 262 F.Supp.2d 1139, 1145 (D. Or. 2003) ("The court also may grant judgment as a matter of law and, alternatively, a new trial when the court's instructions to the jury were legally insufficient. If a party does not raise an objection to the legal sufficiency of the court's proposed jury instructions before the jury is instructed, however, any objection is waived. *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 512 (9th Cir. 2000). See also Fed.R.Civ.P. 51. In addition, a party may waive such an objection by failing to request a specific instruction on the particular issue. . . . *Pape Lift, Inc.*, 115 F.3d . . . [at] 683 . . .").

Defendants next object that the court provided no instruction regarding the factors to be used in determining "likelihood of confusion," i.e.,g the factors set forth in *Sleekcraft*, 599 F.2d at 348-49.[143] Jury Instruction No. 16 included the following language with regard to contributory false designation of origin: "There is a likelihood of confusion when the offending mark is a counterfeit mark, or a mark virtually identical to a previously registered mark coupled with the intent to pass off or borrow from established good will."[144] The Ninth Circuit recently upheld this precise instruction. See *Louis Vuitton Malletier*, 658 F.3d at 945 ("The district court instructed the jury that "[t]here is a likelihood of confusion . . . when the offending mark is a counterfeit mark, or a mark virtually identical to a previously registered mark coupled with the intent to pass off or borrow from established good will." Appellants urge that this instruction misstates the law. . . . This formulation accurately tracks the law").

---

[141]*Id.* at 23; Proposed Jury Instruction, Docket No. 107 (Mar. 20, 2013) at 17.

[142]See RT at 423:4-426:12; 429:10-23.

[143]Rule 59 Opp. at 21.

[144]Jury Instructions at 20.

Finally, defendants argue that the absence of jury instructions on factors that should be considered in assessing statutory damages was error requiring a new trial.[145]  Defendants, however, failed to object to the absence of such an instruction at trial,[146] and thus may not seek a new trial on this basis.  See *Yeti by Molly*, 259 F.3d at 1109; *El-Hakem*, 262 F.Supp.2d at 1145.

Finally, defendants argue the inclusion of the five Coach trademarks on the special verdict form was prejudicial error because there was no evidence that the seized goods bore any of these marks.[147]  Having concluded that there was insufficient evidence to support a finding that five Coach trademarks were infringed, the court agrees that the inclusion of all five marks on the verdict form warrants a new trial.

### III.   CONCLUSION

For the reasons stated, the court denies defendants' Rule 50(b) motion for judgment as a matter of law.  The court grants defendants' Rule 59 motion for a new trial.  The parties are directed to meet and confer and propose three dates, on or after September 2, 2014, for a retrial.

DATED: June 5, 2014

_____

MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

---

[145]Rule 59 Motion at 22-23.

[146]See RT at 430:21-432:19.

[147]Rule 59 Motion at 23.